**MATRIX MOTOR CO., INC., Plaintiff,**

v.

**TOYOTA JIDOSHA KABUSHIKI KAISHA t/a Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor North America, Inc., Defendants.**

No. CV 02–03447 MMM(JTLx).

United States District Court, C.D. California.

April 25, 2003.

Mitchell N. Reinis, Buchalter, Nemer, Fields & Younger, Los Angeles, CA, Irwin M. Friedman, Irwin M. Friedman Law Offices, Gardena, CA, for Plaintiff.

Donald L. Ridge, Morris, Polich & Purdy, Los Angeles, CA, John F. Hornick, Margaret A. Esquenet, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION TO CONTINUE TRIAL DATE, DISCOVERY CUT–OFF DATE AND RELATED DATES

MORROW, District Judge.

Plaintiff Matrix Motor Co. ("Matrix") filed suit against Toyota Jidosha Kabushiki Kaisha t/a Toyota Motor Corp., Toyota Motor Sales, U.S.A., Inc., and Toyota Motor North America, Inc. (collectively "Toyota") on April 26, 2002, alleging false designation of origin, unfair competition, trademark infringement under California law, and common law trademark infringement. On December 18, 2002, Matrix's attorney filed a motion to withdraw as the company's counsel. The motion was denied as moot on January 22, 2003, when Matrix filed a substitution of attorneys form. On March 13, 2003, the court held a telephone status conference, shortly in advance of the April 4, 2003, fact discovery cut-off date set by the court at the scheduling conference. Matrix's new attorney stated that he was in poor health, and had agreed to

substitute into the case only temporarily until Matrix could identify an attorney willing to act as permanent trial counsel. A second lawyer, also on the call, represented that he was prepared to substitute into the case as Matrix's attorney, but only if the discovery cut-off and trial dates were continued for ninety days so that he could conduct necessary discovery. The court declined to extend the case management dates on the basis of plaintiff's oral motion, and directed that it file an appropriate motion to modify the scheduling order if it wished a continuance. The instant motion was filed on March 21, 2003.

## I. FACTUAL BACKGROUND

Some time prior to April 2002, Matrix's CEO, Louis Beuzieron, approached Irwin M. Friedman, an attorney who periodically represented the company, to discuss the possibility of filing a trademark lawsuit against Toyota. Friedman purportedly told Beuzieron that he was not in a position to file the suit, at least in part because of his health, and referred Beuzieron to the law firm of Buchalter, Nemer, Fields & Younger.[1] Friedman did, however, send a cease and desist letter to Toyota on September 17, 2001, demanding that it abandon its planned use of "Matrix" on automobiles and motor car products.[2] Friedman also appears to have responded to Toyota's counsel on October 23, 2001, requesting that he accept service of process on his clients' behalf.[3] Matrix hired the Buchalter firm in April 2002,[4] and it filed suit on Matrix's behalf on April 26,

2002. The complaint alleged claims for false designation of origin, unfair competition, trademark infringement under California law and common law trademark infringement. On June 24, 2002, the Buchalter firm sent a settlement demand to Toyota. Friedman received a copy of this letter.[5]

On September 23, 2002, the court held a Rule 26(f) scheduling conference, and set case management dates. The court directed that plaintiff designate its experts on or before February 4, 2003; that defendant designate its experts by March 4, 2003; that fact discovery be completed by April 4, 2003; that rebuttal expert designations occur no later than April 15, 2003; and the expert discovery be completed on or before May 2, 2003. The court also set a motion hearing cut-off date of May 5, 2003, a pretrial conference date of June 2, 2003 and a trial date of June 24, 2003.

Beuzieron asserts the Buchalter firm never notified him of the discovery or expert deadlines, and did not advise him of the necessity of retaining experts in the case.[6] He contends he had very few conversations with the Buchalter attorney assigned to the case, Mitchell N. Reinis, and that asked Reinis on several occasions between August and November 2002 whether he had conducted discovery and requested documents regarding Toyota's use of the Matrix name and mark.[7] Reinis purportedly told Beuzieron the work was "in progress."[8] Beuzieron asserts he made several requests to have Reinis or a member of his team visit the Matrix factory,

1. Declaration of Louis Beuzieron in Support of Motion to Continue Trial and Related Dates ("Beuzieron Decl."), ¶ 2; Declaration of Irwin Friedman in Support of Motion to Continue Trial and Related Dates ("Friedman Decl."), ¶ 3.

2. Defendants' Opposition to Plaintiff's Motion to Continue Trial and Related Dates ("Defs.' Opp."), Ex. D (Cease and Desist Letter).

3. Defs.' Opp., Ex. E (Oct. 23 Letter).

4. Declaration of Louis Beuzieron in Support of Motion to Continue Trial and Related Dates ("Beuzieron Decl."), ¶ 2; Declaration of Irwin Friedman in Support of Motion to Continue Trial and Related Dates ("Friedman Decl."), ¶ 3.

5. Defs.' Opp., Ex. F (Settlement Demand Letter).

6. Beuzieron Decl., ¶ 4.

7. Beuzieron Decl., ¶¶ 6, 8. In his deposition, Beuzieron stated that he asked these questions three or four times, but did not recall the dates on which he did so. (Defs.' Opp., Ex. B (Deposition of Louis Beuzieron ("Beuzieron Depo.")) at 133:23–134:16).

8. Beuzieron Decl., ¶¶ 6, 8.

to no avail.[9] He also maintains he gave all relevant documents and files to the Buchalter firm as early as November 2002.[10] Beuzieron purportedly tried to get information regarding the status of the case and how he could assist in advancing it, but was "kept in the dark."[11] When asked to clarify this statement at his deposition, Beuzieron said he called Reinis on three, four or five occasions to ask "where we stand and when are we going to serve papers [on Toyota] to produce documents." He was told "it's in the works." Beuzieron did not recall the dates of these conversations.[12]

Margaret A. Esquenet, Toyota's counsel, asserts that plaintiff's responses to Toyota's first set of interrogatories and first set of requests for document production were initially due on November 6, 2002.[13] Reinis' secretary purportedly asked for a thirty day extension to respond on November 4, 2002, and Esquenet sent a letter agreeing to extend the deadline to November 20, 2002.[14] While no documents, responses or objections were received by that date, responses to the interrogatories arrived on November 26, 2002.[15] In a letter dated November 22, 2002, Reinis asserted that answers to the interrogatories had been furnished, as well as "numerous of our client's documents."[16]

Toyota ultimately filed a motion to compel responses to its document production requests, which Magistrate Judge Lum took off calendar on December 12, 2002, for failure to comply with the local rules. Toyota filed a new motion to compel on December 30, 2002, which was granted on January 22, 2003. In her order, Judge Lum noted that the requested document discovery had been due on November 20, 2002, and that a formal response had not yet been provided. She directed that the requested discovery be provided to defendants within thirty days.

On December 18, 2002, Reinis filed a motion on the Buchalter firm's behalf seeking leave to withdraw as Matrix's counsel. Reinis' declaration in support of the motion asserted that his communications with Matrix had completely broken down. He stated that he last spoke with Beuzieron on October 8, 2002, and that his multiple attempts to reach Beuzieron by telephone had been ignored. He further noted that Buchalter's outstanding fees had not been paid.[17] Beuzieron asserts he contacted Friedman after receiving the motion, and Friedman agreed to substitute into the case temporarily until Matrix could locate new counsel.[18] Matrix lodged a substitution of attorneys form on January 21, 2003, substituting Friedman as its counsel. Matrix signed the form on December 20, 2002, and Reinis on January 20, 2003. Friedman's signature is not dated, but he may have signed some time in December 2002. After receiving the substitution form, the court approved Friedman's entry into the case, and denied Reinis' motion to withdraw as moot.

Upon receiving the case file from the Buchalter firm, Friedman states he was "shocked to discover just how little had been done." Specifically, he found that: (1) there was no research in the file; (2) there was no

9. Beuzieron Decl., ¶ 7. Beuzieron testified at his deposition that he made this request on at least two occasions, but did not recall the date of the requests. (Beuzieron Depo. at 133:4–19).

10. Beuzieron Decl., ¶ 5.

11. Beuzieron Decl., ¶ 9.

12. Beuzieron Depo. at 135:11–136:8.

13. Defendants' Opposition to Motion to Withdraw as Counsel ("Withdraw Opp."), Ex. B ("Renewed Motion to Compel Document Production"), Declaration of Margaret A. Esquenet in Support of Defendants' Renewed Motion to Compel Document Production ("Esquenet Compel Decl."), ¶ 4.

14. Esquenet Compel Decl., ¶¶ 2–4.

15. Esquenet Compel Decl., ¶ 5.

16. Renewed Motion to Compel Document Production, Ex. D (Nov. 22 Letter).

17. Declaration of Mitchell N. Reinis in Support of Motion to Withdraw as Counsel ("Reinis Decl."), ¶¶ 3–4.

18. Beuzieron Decl., ¶ 10; Friedman Decl., ¶ 4.

correspondence advising Matrix of the need to retain experts; (3) there was no information regarding the cut-off dates scheduled by the court at the scheduling conference; (4) no discovery had been conducted or commenced; and (5) discovery responses were overdue.[19] Friedman asserts he has done everything he could to comply with discovery orders and outstanding discovery requests since substituting into the case, and notes that he has provided "over five inches of documents to Toyota ... and otherwise attempted to bring the case, and the client, up to speed." [20]

Beuzieron maintains that he has sought counsel to replace Friedman diligently, commencing in December 2002.[21] At his deposition, he testified that he interviewed two or three attorneys after December 2002, but could not recall the dates of the interviews.[22] Following those interviews, Beuzieron contacted attorney David H. Greenberg a few days before March 13, 2003. Greenberg reviewed the case materials and discovered that the Buchalter firm had conducted no discovery before withdrawing from the case. He determined that he would be able to substitute into the case, but only if the court granted a ninety day continuance of the trial date, discovery cut-off date and related dates.[23]

Plaintiff raised the possibility of a continuance of the discovery cut-off and other dates at a telephone status conference held with the court on March 13, 2003. The court declined to grant a continuance on the basis of plaintiff's oral request, and instructed plaintiff to file a formal motion to modify the court's scheduling order if it wished a continuance of the case management dates. The instant motion was filed on March 21, 2003.

## II. DISCUSSION

### A. Standard Governing Modification Of Pretrial Scheduling Orders

■ Rule 16 of the Federal Rules of Civil Procedure authorizes the court to enter pre-

trial scheduling orders, which set dates for the completion of discovery, the hearing of dispositive motions, trial, and other matters. Rule 16(b) provides that the "scheduling order shall not be modified except by leave of court and upon a showing of good cause." FED.R.CIV.PROC. 16(b). Thus, when a plaintiff seeks to continue the dates set by the court at a scheduling conference, it must first show "good cause" for modification of the scheduling order under Rule 16(b). See *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir.2002); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir.1992).

■ This "good cause" standard "primarily considers the diligence of the party seeking the amendment." *Johnson, supra*, 975 F.2d at 609. A party demonstrates good cause for the modification of a scheduling order by showing that, even with the exercise of due diligence, he or she was unable to meet the timetable set forth in the order. See *Zivkovic, supra*, 302 F.3d at 1087; *Johnson, supra*, 975 F.2d at 609. "If the party seeking the modification 'was not diligent, the inquiry should end' and the motion to modify should not be granted." *Zivkovic, supra*, 302 F.3d at 1087 (citation omitted). See also *Johnson, supra*, 975 F.2d at 609 ("Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification").

### B. Whether Matrix Has Demonstrated Diligence In Meeting The Court's Scheduling Order

#### 1. Matrix And Its Attorneys Have Not Acted Diligently

No party seriously disputes that Matrix has failed diligently to prosecute this action.

---

19. Friedman Decl., ¶ 5.

20. Friedman Decl., ¶ 9.

21. Beuzieron Decl., ¶ 11.

22. Beuzieron Depo. at 137:10–138:4.

23. Beuzieron Depo. at 138:5–7; Declaration of David H. Greenberg in Support of Motion to Continue Trial and Related Dates ("Greenberg Decl."), ¶ 2.

While representing Matrix, the Buchalter firm propounded no discovery, did not designate experts, and failed to respond to Toyota's discovery requests in a timely fashion. Toyota, in fact, applied for and obtained a court order compelling document production responses between the time Reinis sought leave to withdraw as counsel and Friedman substituted in as Matrix's attorney. Matrix's deadline to designate expert witnesses passed shortly after that.

Friedman asserts that, since substituting in as counsel, he has attempted to comply with discovery requirements and deadlines.[24] He notes, however, that he is 68 years old, in poor health, and in a solo practice.[25] Toyota disputes Friedman's claim of diligence, asserting that he failed timely to comply with Judge Lum's January 22, 2003, order compelling document production responses, that he directed witnesses not to appear for deposition without seeking a protective order or filing a motion to quash the witness' subpoena, that he has produced documents on the eve of depositions to thwart effective witness questioning, and that he has failed to provide timely responses to Toyota's second set of document requests. While neither party's conduct is a model of professionalism or courtesy, there appears to be no doubt that Matrix is delinquent on certain of its responses to Toyota's discovery. There also appears to be no doubt that Friedman has not initiated any affirmative discovery on Matrix's behalf.[26] Friedman freely admits, for example, that further discovery is needed to develop evidence showing that the report prepared by Toyota's expert is inaccurate.[27]

Matrix at no time sought a continuance of the scheduled dates until Friedman mentioned the matter informally during the telephone status conference conducted on March 13, 2003. This was more than a month after the date for the designation of Matrix's expert had passed, and only twenty-two days before the fact discovery cut-off date established by the court. Attorney Greenberg, whom Matrix contacted only days before the conference, asserts that he conducted an internet search regarding Toyota's infringement of the "Matrix" mark and found substantial evidence of infringement. He contends he needs an additional ninety days of discovery to develop admissible evidence of such infringement to present to a jury.[28]

The Buchalter firm clearly did not make a diligent effort to comply with the case management schedule established by the court. Matrix contends that it should not be charged with its lawyers' lack of diligence. Rather, it contends that its efforts to locate new counsel since December 2002 demonstrate that, unlike its prior attorneys, it has "done everything in its power" to prosecute the case.[29]

### 2. Whether Gross Negligence On The Part Of The Buchalter Firm Justifies A Finding Of Good Cause Despite Plaintiff's Lack Of Diligence

Matrix asserts that its inability to meet the schedule set by the court is due to the Buchalter firm's gross negligence, i.e., its failure to conduct discovery and to disclose to Beuzieron the lack of progress in the case.

### a. Attribution Of Attorney Negligence To Client

It has been long held that a party to litigation "is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Link v. Wabash R. Co.*, 370 U.S. 626, 634, 82 S.Ct. 1386,

---

24. Friedman Decl., ¶ 9.

25. Friedman Decl., ¶¶ 2, 7.

26. Friedman Decl., ¶ 9.

27. Friedman Decl., ¶ 10(d).

28. Greenberg Decl., ¶¶ 2–3.

29. Motion to Continue Trial Date, Discovery Cut-Off Date and Related Dates ("Pl.'s Mot.") at 7:27–28.

8 L.Ed.2d 734 (1962) (quoting *Smith v. Ayer*, 101 U.S. 320, 326, 25 L.Ed. 955 (1880)). See also *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 396–97, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (quoting *Link*); *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141–42 (9th Cir. 1989) (holding that clients are "considered to have notice of all facts known to their lawyer-agent"). In *Link*, the Supreme Court held that the district court properly dismissed a case for failure to prosecute when plaintiff's attorney failed to appear at a scheduled pretrial conference after litigating the action in a dilatory fashion. *Id.* at 633, 82 S.Ct. 1386. The court observed: "There is ... no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 633–34, 82 S.Ct. 1386.

More recently, the Court held that, in examining whether to relieve creditors in a bankruptcy proceeding of a default for "excusable neglect," analysis should focus not on "whether respondents did all they reasonably could in policing the conduct of their attorney, [but] rather ... on whether their attorney, as respondents' agent, did all he reasonably could to comply with the court-ordered bar date." *Pioneer Investment Services, supra*, 507 U.S. at 396, 113 S.Ct. 1489. In *Pioneer*, the creditors had failed to file proofs of claim in a timely fashion in the bankruptcy court, purportedly because of their attorney's negligence. Emphasizing that "respondents [should] be held accountable for the acts and omissions of their chosen counsel," the Court stated that the proper inquiry was "whether the neglect of respondents *and their counsel* was excusable." *Id.* at 397, 113 S.Ct. 1489 (emphasis original).

Despite this well settled rule, the Ninth Circuit has joined other circuits in distinguishing between "a client's accountability for his counsel's neglectful or negligent acts—too often a normal part of representation—and his responsibility for the more unusual circumstance of his attorney's extreme negligence or egregious conduct." *Community Dental Services v. Tani*, 282 F.3d 1164, 1168 (9th Cir.2002).[30] In *Tani*, the court considered a defendant's request to have a default judgment set aside under Rule 60(b)(6), which permits a court to grant relief if a party "demonstrates 'extraordinary circumstances which prevented or rendered him unable to prosecute [his case].'" *Id.* at 1168 (quoting *Martella v. Marine Cooks & Stewards Union*, 448 F.2d 729, 730 (9th Cir.1971) (per curiam)). Noting "the general rule" enunciated in *Link*, the court nonetheless concluded that an attorney's "gross negligence [could] constitute 'extraordinary circumstances' warranting relief under Rule 60(b)(6)." *Id.* See also *id.* at 1169 ("We join the Third, Sixth, and Federal Circuits in holding that where the client has demonstrated gross negligence on the part of his counsel, a default judgment against the client may be set aside pursuant to Rule 60(b)(6)").

---

**30.** Courts recognizing a distinction between negligence and gross negligence grant parties relief from default judgment where their attorneys have displayed "neglect so gross that it is inexcusable." *Boughner v. Sec'y of Health, Educ. & Welfare*, 572 F.2d 976, 978 (3d Cir.1978). See also *Shepard Claims Service, Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 195 (6th Cir.1986) ("Although a party who chooses an attorney takes the risk of suffering from the attorney's incompetence, we do not believe that this record exhibits circumstances in which a client should suffer the ultimate sanction of losing his case without any consideration of the merits because of his attorney's neglect and inattention"); *L.P. Steuart, Inc. v. Matthews*, 329 F.2d 234, 235 (D.C.Cir.1964) (the "extraordinary circum-stance" standard of Rule 60(b)(6) "is broad enough to permit relief when as in this case personal problems of counsel cause him grossly to neglect a diligent client's case and mislead the client"); *Primbs v. United States*, 4 Cl.Ct. 366, 370 (1984) ("The usual understanding of the attorney-client agency relationship, however, should not bar relief under Rule 60(b) when the evidence is clear that the attorney and his client were not acting as one. The agency analysis is particularly inappropriate when the plaintiff has proven that his diligent efforts to prosecute the suit were, without his knowledge, thwarted by his attorney's deceptions and negligence").

674

Turning to the case before it, the court concluded that defendant's attorney had "virtually abandoned" him, engaging in "inexcusable and inexplicable" conduct that included failure to follow court orders, failure to make court appearances, failure to file and serve pleadings, and failure to oppose motions. *Id.* at 1170–71. This resulted, the court stated, in defendant "receiving practically no representation at all." *Id.* at 1171. The situation was exacerbated by the fact both the attorney and defendant's financial advisor "repeatedly" represented that the attorney "was performing his responsibilities, ... deliberately misleading [defendant] and depriving him of the opportunity to take action to preserve his rights." *Id.* Accordingly, the court held that the client had demonstrated "extraordinary circumstances" justifying relief under Rule 60(b)(6). *Id.*

In reaching this result, the court made clear that it was not applying the "excusable neglect" standard of Rule 60(b)(1). See *id.* at 1170, n. 12 ("Our holding that gross negligence on the part of the attorney may constitute 'extraordinary circumstances' under Clause 60(b)(6) does not affect what may be defined as 'excusable neglect' under Clause 60(b)(1). The clauses are mutually exclusive.... The 'excusable neglect' clause is interpreted as encompassing errors made due to the 'mere neglect' of the petitioner whereas (b)(6) is intended to encompass errors or actions beyond the petitioner's control"). The court also distinguished *Link*, noting that it involved a dismissal for failure to prosecute, rather than a motion to vacate a default judgment under Rule 60(b)(6). See *id.* at 1170 ("The Supreme Court's decision in *Link* does not require a contrary result. While it is true that *Link* states that an attorney's actions are chargeable to the client, the Court expressly declined to state whether it would have held that the district court abused its discretion if the issue had arisen in the context of a motion under Rule 60(b).... Thus, *Link* does not serve as a barrier to establishing the rule that gross negligence by a party's counsel may constitute 'extraordinary circumstances' under Rule 60(b)(6)").

Here, the standard is neither "extraordinary circumstances" nor "excusable neglect," but "good cause." Several courts have held that "good cause" requires more than "excusable neglect." See, e.g., *In re Kirkland*, 86 F.3d 172, 175 (10th Cir.1996) (stating that "[t]he *Pioneer* court did not in any way link its discussion of 'excusable neglect' with 'good cause,'" and concluding that "'good cause' requires a greater showing than 'excusable neglect'"); *Lujano v. Omaha Pub. Power Dist.*, 30 F.3d 1032, 1035 (8th Cir. 1994) ("Several courts of appeals have held that good cause requires at least excusable neglect"); *Colasante v. Wells Fargo Corp., Inc.*, 211 F.R.D. 555, 560 (S.D.Iowa 2002) ("The good cause standard requires more than excusable neglect"); *Corkrey v. Internal Revenue Service*, 192 F.R.D. 66, 67 (N.D.N.Y.2000) (stating, in the context of a Rule 16(b) request for modification of a scheduling order, that "[a] difference exists in the standards for 'excusable neglect' and for 'good cause'" and citing *Kirkland*). The *Johnson* court held that Rule 16(b)'s reference to "good cause" was "a close correlate" of "extraordinary circumstances." See *Johnson, supra*, 975 F.2d at 610. Applying these standards, if all Matrix has shown is ordinary negligence on the part of its attorneys, then *Link* applies, and it must be held accountable for its lawyers' lack of diligence. If, on the other hand, it has shown that its lawyers were guilty of gross negligence or abandonment, then, applying *Johnson* and *Tani*, a finding of extraordinary circumstances or good cause, justifying a modification of the scheduling order, would be warranted.

### b. Whether Matrix Has Shown That The Buchalter Firm Was Grossly Negligent

 The record reflects that Reinis participated in the early meeting of counsel,[31]

**31.** See Joint Report of Counsel, filed August 28, 2002.

made court appearances,[32] filed a joint settlement election form,[33] communicated with Matrix regarding the preparation of discovery responses, and made some effort to respond to Toyota's discovery requests, securing an extension of time to respond and serving answers to interrogatories on November 26, 2002. It also reflects that Reinis' failure to respond to discovery in a timely fashion was due at least in part to his inability to communicate with Matrix. Beuzieron asserts that he asked Reinis on three or four occasions between August and November 2002 whether any discovery had been conducted. He cannot provide any information as to when these conversations occurred, however, and proffers no letters or memoranda confirming that any such communications took place. If, as Beuzieron now contends, he was "very concerned" about the progress of the action,[34] and received only vague responses such as discovery was "in the works" or "in progress," [35] he would surely, as a prudent businessman, have taken steps to create a written record of his concerns. If, moreover, his attorney refused to meet with company representatives,[36] he would have taken affirmative steps to locate new counsel. None of these things, however, was done.

Furthermore, Beuzieron concedes that he provided no documents to Reinis for production to Toyota until November 2002.[37] The deadline for producing documents in response to Toyota's first request was November 6, 2002. Reinis requested a thirty-day extension; Toyota agreed to extend the response date to November 20, 2002. Reinis' letter of November 22, 2002, states that documents had been produced as of that date, suggesting that they were not made available earlier because they had not yet been received from Matrix.[38] The record reflects that Reinis was, during this same period, experiencing difficulty contacting Matrix. In a declaration filed in support of Buchalter's motion to withdraw, Reinis reported that he had last spoken with Beuzieron on October 8, 2002, and that, although he had made numerous attempts to contact Matrix since that date, he had received no response. Reinis also reported that Matrix had stopped paying Buchalter's attorneys' fees.[39] Matrix's motion to modify the scheduling order is silent on these points; Beuzieron and Friedman offer absolutely no evidence contradicting Reinis' statements, and the court must, accordingly, accept them as true. Accordingly, the record supports an inference that Reinis' inability to comply with Toyota's discovery requests was a product of his inability to communicate with his client, not a product of gross negligence on his part.

The record, in short, differs significantly from that before the court in *Tani.* There, the attorney "virtually abandoned" his client, failing to make court appearances, file pleadings, and oppose motions. *Tani, supra,* 282 F.3d at 1170–71. Here, Reinis made court appearances, filed necessary pleadings, and responded to some discovery, despite the fact that he was unable to communicate with his client and was not being paid. In *Tani,* the attorney deliberately misled his client about the progress of the case. *Id.* at 1171. Here, at most, Reinis put Beuzieron off with vague comments that discovery to Toyota was "in the works." Unlike the statements of the attorney in *Tani,* this is not the type of remark that "depriv[ed Matrix] of the opportunity to take action to preserve [its] rights." *Id.* at 1171. If anything, it should have spurred Matrix into action, demanding to

---

32. Reinis appeared at the scheduling conference on September 23, 2002.

33. See Docket Entry No. 16.

34. Beuzieron Depo. at 135:18–23.

35. Beuzieron Decl., ¶¶ 6, 8.

36. Beuzieron Decl., ¶ 9.

37. Beuzieron Decl., ¶¶ 5–6, 8; Beuzieron Depo. at 133:23–134:16.

38. Esquenet Compel Decl., ¶¶ 2–5; Renewed Motion to Compel Document Production, Ex. D (Nov. 22 Letter).

39. Reinis Decl., ¶ 3–4.

know exactly what was being done and on what timetable. There is no evidence that Matrix took action to protect its rights, however. Rather, there is evidence that Matrix failed to return Reinis' calls, failed to pay his bills, and failed to cooperate with him in the prosecution of the case. Accordingly, the record before the court does not support a finding that the Buchalter firm engaged in the kind of gross negligence that would constitute good cause for a modification of the court's scheduling order. See, e.g., *WLD Investors, Inc. v. Xecom Corp.,* 35 Fed.Appx. 609, 611 (9th Cir.2002) (Unpub.Disp.) (holding that an defendant was bound by his attorney's failure to file pretrial conference documents shortly before he withdrew as counsel, which resulted in entry of a pretrial conference order stating that the client had submitted no claims or affirmative defenses, no facts, evidence, or exhibits, and no objections to plaintiffs' evidence and exhibits, because the client had "not alleged any 'extraordinary circumstances' which might lead th[e] court to except him from application of th[e] rule" that a "client is presumed to have voluntarily chosen the lawyer as his representative and agent, [and] ordinarily cannot later avoid accountability for negligent acts or omissions of his counsel").

■ This conclusion is reinforced when the recent history of the action is considered. The Buchalter firm sought leave to withdraw in December 2002. Friedman appears to have agreed to enter the case sometime that month, and formally substituted into the action as counsel in January 2003. Friedman obtained the case file from Buchalter, and by his own admission, was able to determine what had been done, and what remained to be accomplished. Represented by Friedman, Matrix had two to three months before the fact discovery cut-off date within which it could have initiated discovery and prepared the case for trial.

Yet Friedman did not act diligently. He failed (1) to respond fully and timely to outstanding discovery requests; (2) to comply with court-ordered document production in a timely fashion; (3) to designate experts; and (4) to propound discovery.[40] Apparently knowing that he did not intend to take the case forward to trial, Friedman did not at any time during January or February advise the court that he intended to withdraw, that Matrix was looking for but had not yet identified new counsel, or that any new attorney would need additional time to conduct discovery and prepare for trial. That information was provided to the court only during the March 13, 2003, status conference, after the date for the designation of expert witnesses had passed, and when only twenty-two days remained to conduct fact discovery. Friedman not only failed to act diligently in preparing the case, therefore, but also failed to act diligently in seeking an extension or continuance so that substitute counsel could do so.

There is no question that Matrix is charged with Friedman's lack of diligence. The company knew when it asked Friedman to substitute into the case that he was willing to serve on a temporary basis only, and that he did not intend to initiate affirmative discovery or move the case forward to trial. It is also charged with his knowledge of the case file—including the case management dates set by the court, the fact that no affirmative discovery had been conducted, and the fact that responses to Toyota's discovery requests were delinquent. It is particularly appropriate to impute such knowledge to Matrix since Friedman appears to have been acting as its corporate counsel with respect to the claims against Toyota since prior to the time the action was filed. Irrespective of the Buchalter firm's conduct, therefore, Matrix did not act diligently during the period it was represented by Friedman to meet the case management schedule established by the court, or to call to the court's attention the need for a modification

40. Friedman's age and alleged ill health are not an adequate explanation for this lack of diligence. If Friedman was unable to assume responsibility for management of the case, he should not have substituted in as Matrix's counsel. Having done so, the court and defendants were entitled to rely on his substitution into the case as an indication that he was able competently to perform the duties required of him as Matrix's attorney of record.

of that schedule.[41] It cannot, accordingly, show good cause justifying a continuance of the discovery cut-off and trial dates. See *Zivkovic, supra,* 302 F.3d at 1087–88 ("Zivkovic's counsel did not seek to modify [the pretrial scheduling] order until four months after the court issued the order. Zivkovic did not demonstrate diligence in complying with the dates set by the district court, and has not demonstrated 'good cause' for modifying the scheduling order, as required by Fed.R.Civ.P. 16(b)"). See also *Shapiro, Lifschitz & Schram, P.C. v. Hazard,* 97 F.Supp.2d 8, 11 (D.D.C.2000) (declining to modify a scheduling order to permit the reopening of discovery, an extension of time to submit expert reports, and a continuance to oppose a motion for summary judgment because defendant had failed to show good cause under Rule 16, the court stated: "Any unfortunate results from the inability of defendants' counsel (including their counsel in California) to maintain discovery materials or file timely motions for extensions of time arise from their own voluntary choice of attorneys.... The Court finds no good cause to grant any of defendants' motions," citing *Link v. Wabash Railroad Co.,* 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).

## III. CONCLUSION

For the foregoing reasons, plaintiff's motion to continue dates is denied.

---

**41.** Nor does it appear that Beuzieron acted diligently to obtain replacement counsel for Friedman. While Beuzieron asserts in conclusory fashion that he did, his declaration provides no specifics as to what steps he took or when he took them. During his deposition, Beuzieron stated that he interviewed two or three attorneys. Yet he could not recall the dates of the interviews, and Greenberg states that he was contacted only days before the March 13, 2003, status conference.