**Richard REINSDORF, Plaintiff,**

v.

**SKECHERS U.S.A., INC.,**
**et al., Defendants.**

**No. CV 10–7181 DDP (SSx).**

United States District Court,
C.D. California.

July 19, 2013.

608

Dylan Ruga, Charlene Minx Lee, Harvey Geller, Steptoe and Johnson, LLP, Los Angeles, CA, for Plaintiff.

Daniel M. Petrocelli, Drew E. Breuder, Justine M. Daniels, O'Melveny and Myers, LLP, Robert C. Welsh, Baker & Hostetler, Los Angeles, CA, for Defendants.

## ORDER DENYING PLAINTIFF'S REQUEST TO REOPEN DISCOVERY AND FOR DISCOVERY SANCTIONS

[Dkt. Nos. 271, 285, 308 and related documents]

SUZANNE H. SEGAL, United States Magistrate Judge.

## I.

## INTRODUCTION

This Order addresses whether Plaintiff Richard Reinsdorf has presented sufficient evidence of discovery misconduct by Defendants Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II (collectively, "Skechers") to warrant the re-opening of discovery or other potential sanctions. As is discussed more fully below, the Court finds that discovery should remain closed and no sanctions should issue because Skechers did not improperly withhold or destroy relevant evidence.[1]

### A. *History*

This case involves allegations that Skechers infringed Reinsdorf's copyright in photographs taken for use in Skechers' shoe marketing campaigns. On August 9, 2011, the Court issued a Scheduling Order setting a discovery cut-off of April 2, 2012 for all purposes, including fact and expert discovery and related motions, (Dkt. No. 37 at 1–2), which the Court later extended to May 15, 2012. (Dkt. No. 69 at 1). The Order also set May 4, 2012 as the deadline to file dispositive motions, (Dkt. No. 37 at 2), which the Court later extended to May 21, 2012. (Dkt. No. 80 at 1).

On May 21, 2012, Skechers filed a Motion for Summary Judgment based, in part, on Skechers' assertion of a joint work defense and its contention that Reinsdorf's claim for indirect profits was too speculative. (Dkt. No. 125 at 14–22 & 26–32). On the same day, Skechers filed Motions in Limine to Exclude the Testimony of two of Reinsdorf's experts: Frank Luntz, who opined that Reinsdorf's photos influenced consumers' decisions to buy Skechers' products, (Dkt. No. 127), and Jamie Turner, who offered an opinion on the amount of Skechers' profits attributable to Skechers' use of Reinsdorf's photos. (Dkt. Nos. 128 & 139). While Skechers' motions were pending, on July 2, 2012, Skechers filed a Motion to Strike the Supplemental Report of another of Reinsdorf's experts, David B. Connelly, who opined specifically about Skechers' indirect profits. (Dkt. No. 185).

On October 9, 2012, the Court issued an Order denying Skechers' Motion for Summary Judgment on the ground that Skechers had not "demonstrated that the parties intended to be co-authors of the finished marketing images, which are, therefore, not joint works." (Dkt. No. 196 at 21). In the same Order, however, the Court granted Skechers' Motions in Limine to exclude the testimony and reports of Luntz and Turner because the methodologies they employed in reaching their opinions were deficient. (*Id.* at 13–19). Skechers filed a Motion for Clarification on November 5, 2012, seeking a further ruling on certain additional grounds raised in its MSJ, including Skechers' indirect profits argument, and on its Motion to Strike Connelly's Supplemental Report. (Dkt. No. 198 at 5–10).

On December 3, 2012, while Skechers' Motion for Clarification was pending, Reinsdorf moved to substitute the firm Steptoe & Johnson LLP in the place of his counsel up to that point, Lavely & Singer. (Dkt. Nos. 207–08). On December 4, 2012, the Court granted Reinsdorf's Applications to Substitute Attorney. (Dkt. Nos. 210–11).

On February 6, 2012, the Court issued an Amended Order on Skechers' MSJ and Mo-

---

1. The Court acknowledges and expresses its appreciation for the excellent representation, briefing and oral argument provided by all counsel in connection with these difficult discovery issues.

tions in Limine, which superseded its prior Order. (Dkt. No. 225). In the Amended Order, the Court reaffirmed its prior finding that a genuine dispute of material fact existed as to whether Skechers' finished advertisements were the products of joint authors. (*Id.* at 12). The Court also reaffirmed its decision to exclude the testimony of Luntz and Turner. (*Id.* at 20 & 23). In addition, however, the Court granted Skechers' Motion to Strike the Supplemental Report of David B. Connelly on the grounds that it was untimely and methodologically deficient. (*Id.* at 25–26). Furthermore, "[g]iven Reinsdorf's failure to adequately demonstrate a causal link between Skechers' profits and its allegedly infringing conduct," the Court also granted Skechers' MSJ on Reinsdorf's indirect profits claim. (*Id.* at 27).

Slightly less than three weeks later, on February 25, 2013, Reinsdorf's new counsel filed a "Motion for Relief from, and Reconsideration of, the Court's Amended Order" on Skechers' MSJ, Motions in Limine, and Objections to Evidence. (Dkt. No. 229). Reinsdorf alleged, among other things, that newly discovered evidence established that Skechers maintained relevant financial information but had failed to produce it and that Skechers tracked the effectiveness of its marketing on sales, despite Skechers' representations to counsel and the Court to the

contrary. (*Id.* at 4–15). Reinsdorf also alleged that Skechers had spoliated material evidence. (*Id.* at 16). Following extensive briefing by the Parties, the Court set a hearing on Reinsdorf's Motion for Relief and Reconsideration for March 29, 2013. (Dkt. No. 254). However, on March 26, 2013, the Court issued an Order taking the March 29, 2013 hearing off calendar and referring the matter to the undersigned Magistrate Judge to resolve Plaintiff's allegations regarding Skechers' discovery responses. (Dkt. No. 255).

### B. *Proceedings Before The Magistrate Judge*

The Magistrate Judge held an initial hearing on March 28, 2013. (Dkt. No. 257). The Court requested that the Parties meet and confer, and set a briefing schedule for supplemental briefing on any discovery issues that might remain. (*Id.* at 1). Following a telephonic status conference on April 9, 2013, the Court revised the briefing schedule and set a hearing date.[2] (Dkt. No. 265 at 1).

On April 22, 2013, Reinsdorf filed a Supplemental Brief in support of his Motion for Relief and Reconsideration ("Supp. Memo."), including the declarations of Dylan Ruga ("Ruga Decl."), Samuel S. Rubin ("Rubin Decl."), and Peter A. Salomon ("Salomon Decl."). (Dkt. No. 271).[3] On May 6, 2013,

---

**2.** The day after the telephonic hearing, on April 10, 2013, Reinsdorf received directly from one of Skechers' employees a copy of a recall notice issued by Skechers, which Reinsdorf immediately forwarded to counsel. The recall notice required Skechers' stores to pull any shoeboxes with Reinsdorf's photographs. Prior to Reinsdorf's receipt of the document through informal means, the Parties had been disputing whether the recall notice was privileged or discoverable. Reinsdorf's counsel sequestered the document, notified Skechers, and attempted to resolve informally Reinsdorf's entitlement to retain and use the document. On April 24, 2013, Skechers filed an *Ex Parte* Application seeking the return of the document, further discovery about how Reinsdorf obtained it, and sanctions. (Dkt. No. 274). Reinsdorf filed an Opposition on April 26, 2013. (Dkt. No. 280). Skechers filed a Reply on April 29, 2013. The District Judge referred the matter to the Magistrate Judge on May 2, 2013. (Dkt. No. 282). The Court held a telephonic hearing on May 9, 2013. (Dkt. No. 300).

Following the hearing, the Court ordered Reinsdorf to submit a declaration responding to

specific questions the Court had about the circumstances under which he obtained the document. (Dkt. No. 303). Reinsdorf submitted the Declaration on May 17, 2013. (Dkt. No. 318). On May 20, 2013, Skechers filed a Response to the Declaration. (Dkt. No. 320). The Court concluded that Reinsdorf was a passive recipient of the recall notice and had not solicited its production, and therefore denied Skechers' requests for further discovery and sanctions on May 31, 2013. (Dkt. No. 324 at 8). However, because Skechers continued to assert that the document was privileged, the Court ordered Reinsdorf to turn over his copies of the recall notice to Skechers pending further proceedings to determine whether the privilege properly applied. (*Id.* at 11). On June 14, 2013, Skechers filed a Motion for Reconsideration of the Court's May 31, 2013 Order. (Dkt. No. 330).

**3.** Reinsdorf filed Exhibit 15 to the Ruga Declaration separately at Docket No. 273. In addition, Exhibits 2 and 3 to the Ruga Declaration, and the Salomon Declaration and all of its accompanying exhibits were filed separately under seal at Docket No. 278.

Skechers filed an Opposition ("Opp.," Dkt. No. 285). In support of the Opposition, Skechers filed Evidentiary Objections to the Ruga, Rubin, and Salomon Declarations ("D Obj.," Dkt. No. 286), and the declarations of Drew E. Breuder ("Breuder Decl.," Dkt. No. 287), Jennifer Clay ("Clay Decl.," Dkt. No. 288), Clay Irving ("Irving Decl.," Dkt. No. 289), Michael Primeaux ("Primeaux Decl.," Dkt. No. 290), David Weinberg ("Weinberg Decl.," Dkt. No. 291), Neil Freeman ("Freeman Decl.," Dkt. No. 292), Dominique M. Hanssens ("Hanssens Decl.," Dkt. No. 293), Timothy Lakin ("Lakin Decl.," Dkt. No. 294), John David Moody ("Moody Decl.," Dkt. No. 295), and Robert C. Welsh ("Welsh Decl.," Dkt. No. 296). On May 13, 2013, Reinsdorf filed a Reply ("Reply," Dkt. No. 308), including Evidentiary Objections to Skechers' Declarations ("P Obj.," Dkt. No. 312), and the supplemental declarations of Dylan Ruga ("Ruga Supp. Decl.," Dkt. No. 309), Samuel S. Rubin ("Rubin Supp. Decl.," Dkt. No. 310), and Peter A. Salomon ("Salomon Supp. Decl.," Dkt. No. 311).[4] On May 15, 2013, Skechers filed Evidentiary Objections to the Rubin and Salomon Supplemental Declarations ("D Supp. Obj.," Dkt. No. 316). On May 28, 2013, Skechers filed a Response to Reinsdorf's Evidentiary Objections to Skechers' Declarations[5] ("D Supp. Obj. Resp.," Dkt. No. 322).

On June 3, 2013, the Court held a hearing. (Dkt. No. 325). At the conclusion of the hearing, the Court took the matter under submission. (*Id.*). After careful consideration of the briefs, evidence and argument, the Court finds that Reinsdorf has failed to establish discovery misconduct or spoliation sufficient to justify re-opening discovery.

4. Reinsdorf filed Exhibit G to the Salomon Supplemental Declaration separately under seal at Docket No. 319.

5. Each party raises numerous objections to the opposing party's declarations, often on the grounds that the declarant's statements are irrelevant, vague, unhelpful, conclusory or speculative. (*See* D. Obj., D. Supp. Obj., P. Obj.). Indeed, the majority of the objections appear directed to the weight that should be accorded the evidence rather than to its admissibility. All evidentiary objections raised by either Reinsdorf

## II.

## THE PARTIES' CONTENTIONS

Reinsdorf contends that Skechers misled him and the Court about the existence of certain categories of documents, improperly withheld production of relevant information sought by his discovery requests, and then used the absence of that evidence to support its argument on summary judgment that Reinsdorf's indirect damages were too speculative. (Supp. Memo. at 2–4). In addition, Reinsdorf contends that Skechers spoliated relevant documents from Skechers' Media Share Website. (*Id.* at 4–5). In light of these alleged discovery abuses, Reinsdorf asks the Court to re-open merits discovery "to allow a full and proper briefing of the issue of [Reinsdorf's] damages" and to order a forensic analysis of Skechers' servers and an evidentiary hearing "to explore the full extent of [Skechers'] spoliation of evidence." (*Id.* at 5).

Specifically, Reinsdorf argues that Skechers was required to produce differentiated sales data not only in response to Reinsdorf's discovery requests, but also pursuant to the initial disclosure obligations of Rule 26. (*Id.* at 2, 15–17). According to Reinsdorf, Skechers "purposely withheld product line and product-by-product sales documents" and "misled the Court about the existence of those documents in a declaration filed by its expert" Dominique Hanssens. (*Id.* at 2; *see also id.* at 10–17). In support of this claim, Reinsdorf notes that Rick Graham, Skechers' Senior Vice President of Domestic Sales, filed a declaration in an unrelated out of state case that reveals that Skechers keeps very detailed product line sales records. (*Id.* at 14). Reinsdorf also argues that although Skechers agreed to

or Skechers that are not specifically addressed in this Report are denied without prejudice as moot, with leave to reassert the objections at a later stage in the proceedings. *See PacifiCorp v. Northwest Pipeline GP*, 879 F.Supp.2d 1171, 1194 n. 7 & 1214 (D.Or.2012) (declining to address evidentiary objections where the court would reach the same conclusions whether or not it considered the challenged materials). To the extent that the Court does rely in the Report on any evidence objected to, the objections are overruled.

produce Skechers' general ledger, the data Skechers produced contained only the aggregated "rolled up" numbers, not the subledgers that track the detailed information underlying the aggregated numbers. (*Id.* at 3–4, 25–27). Reinsdorf asserts that the production is insufficient because "a general ledger is a complete record of all of a company's financial transactions," not just aggregated "rolled up" numbers. (*Id.* at 26).

Reinsdorf further contends that Skechers repeatedly represented that Skechers does not have marketing plans or track revenues attributable to particular marketing or advertising campaigns. (*Id.* at 3, 17–18, 21–22). However, Reinsdorf discovered a PowerPoint presentation on Skechers' then publicly-available Media Share Website entitled "International Advertising & Marketing Systems & Procedures 2011" (the "2011 Advertising PowerPoint"). (*Id.* at 19). According to Reinsdorf, the 2011 Advertising PowerPoint, which was not produced, shows that Skechers both has marketing plans and tracks the effectiveness of its advertisements on sales. (*Id.* at 3, 23). Another document found on the Media Share Website indicates that Skechers "insists upon receiving monthly marketing reports" (the "2011 Marketing Expectations Memo"), which Reinsdorf argues is further evidence of the existence of documents that track the sales effectiveness of marketing spend. (*Id.* at 20, 23). Furthermore, on third party websites, Reinsdorf has found an article quoting a Skechers marketing executive who discusses the return on ad spend for a selected group of internet advertisements, (Ruga Decl., Exh. 10 at 110–11), and a promotional release that he claims shows that Skechers hires marketing companies to help it "maximize return on its advertising spend for its retail website." (*Id.* at 24) (quoting Ruga Decl., Exh. 11 at 112).

Finally, Reinsdorf contends that Skechers "destroyed documents and metadata" which it was required to preserve, including "at least 89 folders and hundreds of files from the [Media] Share Website, including marketing documents containing Reinsdorf's images." (*Id.* at 4; *see also id.* at 27–30) (emphasis omitted). In particular, Reinsdorf claims that a deleted folder entitled "2010_MarketingBinder/" (the "2010 Marketing Binder") is representative of the information deleted by Skechers. Though not produced by Skechers, the 2010 Marketing Binder was "fortuitously found" by Reinsdorf in another folder on the Media Share Website and "unmistakably shows that Resindorf's images were used internationally...." (*Id.* at 29). Although Reinsdorf acknowledges that Skechers has since produced 61 of the 89 deleted folders, Reinsdorf argues that the production is suspect because (1) not all of the recently-produced folders have the same name as the deleted folders, and (2) not all of the folders are identical to the copies of the folders that Reinsdorf downloaded from Skechers' Media Share Website (even if the folders had matching names) before they were deleted. (*Id.* at 28; Rubin Decl. ¶ 14). Reinsdorf also contends that even if Skechers were to produce all 89 folders from other sources, the metadata from the Media Share Website is irretrievably lost. (Supp. Memo. at 28).

Skechers counters that Reinsdorf's inability to prove indirect profits is "the direct result of deliberate, conscious and tactical choices Reinsdorf made during discovery," not misconduct by Skechers. (Opp. at 1). According to Skechers, all of Reinsdorf's current contentions could have been explored during discovery, and Reinsdorf's regret over the discovery choices he made "does not entitle him to a discovery do-over." (*Id.* at 4).

With respect to Reinsdorf's allegations that Skechers misrepresented and improperly withheld financial data, Skechers does not deny that it maintains product line sales information, but argues that none of Reinsdorf's discovery requests required the production of such information. (*Id.* at 2, 4–14). According to Skechers, Reinsdorf was aware of the scope of Skechers' production and it was incumbent on him to file a motion to compel during the discovery period if he believed that product line information was called for by his discovery requests. (*Id.* at 8). Skechers further argues that it was not required to produce product line data pursuant to Rule 26 because the Rule requires production of documents a party intends to use, not any document that might be relevant to a claim or defense. (*Id.* at 9–10). Skech-

ers also contends that it provided Reinsdorf with a "complete and unexpurgated copy of its general ledger data." (*Id.* at 2; *see also id.* at 15–18). According to Skechers, its general ledger database does not contain specific product line data, which is maintained in a separate database, and pursuant to generally accepted accounting practices, subledgers are not considered part of the general ledger. (*Id.* at 3, 16–17).

In addition, Skechers states that it accurately represented that it does not have formal marketing plans. (*Id.* at 3). While Skechers objected to producing general marketing documents, it did produce "those marketing documents that pertain to the use of Reinsdorf's photographs." (*Id.* at 19; *see also id.* at 22). Because neither the 2011 Advertising PowerPoint nor the 2011 Marketing Expectations Memo, which Reinsdorf claims suggest the existence of marketing plans, specifically referred to Reinsdorf, Skechers was under no obligation to produce them. (*Id.* at 25–27). Skechers further argues that the "media plans" discussed in the 2011 Advertising PowerPoint are not "marketing plans" because they merely "specify the media tools," such as a local television station, that will be used to communicate with a targeted audience. (*Id.* at 25). Skechers further asserts that Reinsdorf's focus on discrete passages in the 2011 Advertising PowerPoint and the 2011 Marketing Expectations Memo to prove that Skechers tracked the effectiveness of its marketing initiatives on sales is misplaced. (*Id.* at 3). The phrase "track effectiveness" in the 2011 Advertising PowerPoint did not refer to prospective sales resulting from any particular ad, but instead was part of a directive to subsidiaries requiring them to inform Skechers of prior sales totals of the products the subsidiaries wished to feature in any modified advertisement. (*Id.* at 28). Similarly, the use of the word "effective" or "effective-

ness" in the 2011 Marketing Expectations Memo concerned general brand awareness, not increased sales of particular products. (*Id.* at 29).

Skechers specifically contends that there are no documents analyzing the marketing effectiveness of Reinsdorf's photographs. (*Id.* at 3, 29). Skechers claims that no display or pop-up ads used Reinsdorf's images.[6] (*Id.* at 29–30). The images attached to Mr. Ruga's declaration as Exhibit 2 were not used in display or pop-up ads, but "were used for other marketing purposes, including as 'filler' graphics displayed on Skechers' own website." (*Id.* at 30). However, because Skechers does not track "click-through data" to determine how a customer reaches a particular product on Skechers.com, it has no data on the effectiveness of the images used as filler graphics. (*Id.*).

Finally, Skechers contends that it did not spoliate evidence. According to Skechers, it has provided Reinsdorf with either the original versions or descriptions of the likely contents of "nearly all of the 90 Media Share Files" that form the basis of Reinsdorf's spoliation claim.[7] (*Id.* at 4). According to Skechers, none of the recovered Media Share Website documents are relevant to the issue of indirect profits and therefore Skechers was under no obligation to preserve them. (*Id.* at 4, 32). The fact that Skechers has been unable to locate approximately five folders does not mean that the documents were not produced, because documents posted to the Media Share Website are copies of documents created and stored elsewhere and "do not always match the names of the original copies of the documents." (*Id.* at 33). In particular with respect to the 2010 Marketing Binder, Skechers produced another document entitled "2010 Marketing Binder," which it erroneously believed was identical to the document located by Reinsdorf. (*Id.* at

---

**6.** Counsel explained at the hearing that pop-up ads appear over the content of the web page the reader is viewing, while display ads appear off to the side and do not obscure the page. (Trans., Dkt. No. 328, at 86, 1.4–6). Skechers states that while it has used "display" ads, it has never used "pop-up" ads. (Lakin Decl. ¶¶ 4–5).

**7.** The deleted documents at issue consist of 89 folders, each of which may contain several files,

and one stand alone file. (Rubin Decl. ¶ 3). In their briefs, Reinsdorf focuses on the "deleted 89 *folders* containing hundreds of *files*," (Supp. Memo. at 27), while Skechers generally refers to the combined folders and file as the "90 Media Share Files." (Opp. at 31). The Court will refer to the deleted folders and stand alone files as "documents."

34). In addition, Skechers asserts that it has "produced other documents containing the same information" and therefore Reinsdorf has not been prejudiced. (*Id.* at 4, 34–36). Furthermore, because all of the documents on the Media Share Website were copies, Skechers asserts that their deletion cannot "constitute spoliation as a matter of law." (*Id.* at 32).

## III.

### STANDARDS FOR RECONSIDERATION AND FOR RE–OPENING DISCOVERY

A district court is authorized to reconsider its decisions pursuant to both the Federal Rules of Civil Procedure and its inherent powers. Rule 54(b) provides that unless certified as a final judgment by the district court, "any order or other decision, however designated, that adjudicates fewer than all the claims" of all of the parties "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R.Civ.P. 54(b). In addition to this specific authorization, a court has the inherent power to reconsider its own orders. *See Amarel v. Connell,* 102 F.3d 1494, 1515 (9th Cir.1996) ("[T]he interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment."). Pursuant to Local Rule 7–18, a motion for reconsideration may be made only on the grounds of:

> (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

C.D. Cal. L.R. 7–18. Newly-discovered evidence of a party's discovery misconduct may provide grounds for granting a motion for reconsideration where the abuses prevented the opposing party from properly prosecuting or defending its case. *See, e.g., Pumphrey v. K.W. Thompson Tool Co.,* 62 F.3d 1128, 1132, 1134 (9th Cir.1995) (granting new trial based on post-verdict disclosures showing that defendant's "misleading, inaccurate, and incomplete responses to discovery" harmed the integrity of the judicial process).

However, a party's dissatisfaction with counsel's strategic decisions after an adverse result on a motion is not a proper ground for granting a motion for reconsideration, even if counsel was arguably negligent. A client is presumed to have voluntarily chosen counsel as his or her representative and "ordinarily cannot later avoid accountability for negligent acts or omissions of his counsel." *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha,* 218 F.R.D. 667, 676 (C.D.Cal.2003) (citations and quotations omitted); *see also Hussain v. Nicholson,* 435 F.3d 359, 364 (D.C.Cir.2006) ("[A] party who voluntarily chooses his attorney 'cannot … avoid the consequences of the acts or omissions of this freely selected agent.'") (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). Nor is the hiring of new counsel sufficient in itself to warrant reopening discovery to correct prior counsel's purported errors. *See, e.g., Marcin Eng'g LLC v. The Founders at Grizzly Ranch, LLC,* 219 F.R.D. 516, 521 (D.Colo.2003) ("That new counsel is dissatisfied with the state of the case it inherited is not grounds under this authority for reopening discovery long after the court-ordered deadlines have passed."); *Vineberg v. Bissonnette,* 548 F.3d 50, 55 (1st Cir.2008) ("The engagement of a new attorney, without more, does not compel—or even necessarily favor— the reopening of a previously closed period of discovery."); *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996) ("There is no principle that each new attorney for a litigant must have an independent opportunity to conduct discovery. Shortcomings in counsel's work come to rest with the party represented.").

Furthermore, a showing that a particular document or documents were not produced or were produced late in the discovery period does not, by itself, necessarily require

granting a motion for reconsideration to re-open discovery. "[T]he discovery process relies upon the good faith and professional obligations of counsel to reasonably and diligently search for and produce responsive documents." *Smith v. Life Investors Ins. Co. of America*, 2009 WL 2045197 at *5 (W.D.Pa. July 09, 2009). However, while parties must impose a reasonable construction on discovery requests and conduct a reasonable search when responding to the requests, the Federal Rules do not demand perfection. *See, e.g., Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 618–19 (D.Colo.2007) (parties have "an obligation to construe ... discovery requests in a reasonable manner"); *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 212 F.R.D. 178, 223 (S.D.N.Y.2003) (Rule 26(g) requires a "reasonable inquiry under the circumstances"); *Moore v. Publicis Groupe*, 287 F.R.D. 182, 188 (S.D.N.Y. 2012) ("[T]he Federal Rules of Civil Procedure do not require perfection."); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F.Supp.2d 456, 461 (S.D.N.Y.2010) (*"Pension Comm."*) ("Courts cannot and do not expect that any party can meet a standard of perfection."), *abrogated on other grounds by Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir.2012). "The reasonableness of the inquiry is measured by an objective standard...." [8] *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 555 (N.D.Cal.1987).

▆ In addition, "[i]t is improper to infer nefarious intent or bad faith" from "ordinary discovery errors." *PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*, 187 F.3d 988, 993 (8th Cir.1999). Consequently, when adjudicating allegations of discovery misconduct as the basis for a motion for reconsideration, the court will inquire whether the producing party's search and response were objectively reasonable under the circumstances, not whether the search

and response were error-free. In evaluating the reasonableness of a search, the court should not only weigh the burdensomeness and importance of the discovery requested, but should also seek to further "the just, speedy, and inexpensive determination of every action" as required by Rule 1. As one court explained,

> The rules of discovery do not demand perfection, clairvoyance, or miracle workings in the production of documents. Crying foul and casting aspersions whenever there's a hole in defendants' document productions or whenever some small number of documents (even crucial documents) are found relatively late in the process does not advance plaintiffs' cause and is not conducive to the timely, efficient resolution of this litigation.

*Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL 987457 at *3 (S.D.Ala. Mar. 30, 2007). A party may comply in good faith with its discovery obligations and yet there may be supplemental productions or even additional responsive documents that were inadvertently omitted. Such supplemental productions or responses do not necessarily equate to discovery misconduct.

## IV.

## SKECHERS' PRODUCTION OF FINANCIAL INFORMATION ADEQUATELY RESPONDED TO THE DISCOVERY REQUESTS AND DID NOT VIOLATE THE REQUIREMENTS OF RULE 26

Reinsdorf contends that Skechers was obligated to produce differentiated sales data, *i.e.,* product line or product-by-product sales information, both in response to specific discovery requests and, independent of any request, under Rule 26. (Supp. Memo. at 10–17). According to Reinsdorf, instead of producing differentiated sales data, Skechers falsely represented that it did not have any such information, which precluded Reinsdorf

---

**8.** Pursuant to Rule 26(g)(1)(B), by signing a discovery request or response, the attorney or party "certifies that to the best of the person's knowledge, information, and belief, *formed after a reasonable inquiry,*" the request or response is consistent with existing law and is not interposed for an improper purpose. Fed.R.Civ.P. 26(g)(1)(A-

B) (emphasis added). However, Rule 26(g)(1)(B) "does not call for certification that the discovery response is 'complete,'" as does the parallel provision for mandatory disclosures under Rule 26(a), "but rather incorporates the Rule 26(b)(2)(C) proportionality principle." *Moore*, 287 F.R.D. at 188.

from filing a motion to compel production of the purportedly non-existent data. (*Id.; see also* Reply at 5). Reinsdorf further contends that Skechers' production of its general ledger is incomplete because it does not include the underlying subledgers from which the aggregate numbers in the general ledger were derived. (Supp. Memo. at 25–27).

## A. *Reinsdorf's Discovery Requests Did Not Require Production Of Differentiated Sales Data*

Reinsdorf argues that Skechers was obligated to produce differentiated sales data in response to 12 different production requests: RFP Nos. 158, 171, 179–180, and 182–189. (Supp. Memo. at 10–11). The Court disagrees.

■ RFP No. S158 sought documents "sufficient to evidence [Skechers'] revenues and profits from 2006 until the present." (Declaration of William J. Briggs filed in Opposition to Skechers' MSJ ("Briggs Decl."), Exh. 38 at 617, Dkt. No. 159.2). Skechers objected, but later agreed to produce Skechers' annual reports. (Welsh Decl., Exh. N at 616; *id.*, Exh. L at 469). It is axiomatic that a request for documents "sufficient to show" does not require the production of all conceivably relevant information. Skechers' production of its annual reports adequately responded to RFP 158.

■ RFP No. 171 sought documents that evidence Skechers' "deductible expenses and/or elements of profit from 2006 until the present that [Skechers] contend[s] are attributable to factors other than [Skechers'] alleged infringements of photographs taken by Reinsdorf." [9] (Briggs Decl., Dkt. No. 159. 4, Exh. 40 at 650). Skechers objected on the ground that the request was unduly burdensome because it would require Skechers "to produce literally every document relating to the company's expenses and profits" in light of its contention that *all* of Skechers' "elements of profit" were attributable to factors other than the alleged infringements. (Welsh Decl., Exh. P. at 651). However,

Skechers stated that it was willing to meet and confer with Reinsdorf about any additional documents beyond Skechers' annual reports that Reinsdorf felt it needed. (*Id.* at 652). Skechers eventually agreed in open court to produce its general ledger in response to RFP No. 171. (*See* Supp. Memo. at 11) (Welsh Decl., Exh. D at 200).

■ The Court finds that RFP No. 171 did not require Skechers to produce product line data. In the first instance, this all-encompassing request did not put Skechers on fair notice that Reinsdorf sought product line data. Rule 34(b) requires the requesting party to describe the items to be produced with "reasonable particularity." Fed.R.Civ.P. 34(b)(1–2). "The test for reasonable particularity is whether the request places a party upon 'reasonable notice of what is called for and what is not.'" *Bruggeman ex rel. Bruggeman v. Blagojevich*, 219 F.R.D. 430, 436 (N.D.Ill.2004) (quoting *Parsons v. Jefferson–Pilot Corp.*, 141 F.R.D. 408, 412 (M.D.N.C.1992)); *see also Regan–Touhy v. Walgreen Co.*, 526 F.3d 641, 649–50 (10th Cir.2008) ("[A] discovery request should be sufficiently definite and limited in scope that it can be said 'to apprise a person of ordinary intelligence what documents are required and [to enable] the court … to ascertain whether the requested documents have been produced.'") (quoting Wright & Miller, 8A Federal Practice and Procedure § 2211, at 415). " 'All-encompassing demands' that do not allow a reasonable person to ascertain which documents are required do not meet the particularity standard of Rule 34(b)(1)(A)." *In re Asbestos Products Liability Litigation (No. VI)*, 256 F.R.D. 151, 157 (E.D.Pa.2009). As one court explained,

> Requests should be reasonably specific, allowing the respondent to readily identify what is wanted. Requests which are worded too broadly or are too all inclusive of a general topic function like a giant broom, sweeping everything in their path, useful or not. They require the respondent either to guess or move through men-

---

9. Similarly, topic 14 of Reinsdorf's Notice of 30(b)(6) Deposition of Skechers U.S.A., Inc. sought information about "Skechers' deductible expenses and elements of profit from 2006 through the present attributable to factors other

than photographs authored by Reinsdorf." (Declaration of Drew E. Breuder in support of Skechers' Motion to Compel further Responses and for Protective Order, Dkt. No. 89.1, Exh. 8 at 56).

tal gymnastics which are unreasonably time-consuming and burdensome to determine which of many pieces of paper may conceivably contain some detail, either obvious or hidden, within the scope of the request.

*Dauska v. Green Bay Packaging, Inc.,* 291 F.R.D. 251, 261, 2013 WL 2088216 at *10 (E.D.Wis. May 14, 2013) (quoting *Audiotext Communications v. U.S. Telecom, Inc.,* 1995 WL 18759 at *1 (D.Kan. Jan. 17, 1995)). RFP No. 171 failed to provide sufficient guidance to Skechers regarding the particular documents or data Reinsdorf demanded. Under the Federal Rules, Skechers was not required to guess.

More importantly, whatever categories of documents and data the request may have encompassed, RFP No. 171 appears to explicitly exclude information that would be supportive of Reinsdorf's indirect profits claim, *i.e.,* the request sought information pertaining to profits *not* attributable to Reinsdorf's photographs. Therefore, any documents produced in response to the request would not necessarily change the outcome of Skechers' Motion for Summary Judgment. According to the Ninth Circuit, Reinsdorf has the initial burden of proving a causal nexus between the alleged infringement and the alleged infringer's gross profits. *Polar Bear Productions, Inc. v. Timex Corp.,* 384 F.3d 700, 711 (9th Cir.2004). Only after the plaintiff has established the requisite causal nexus does the burden shift to the defendant to apportion the profits that were not the result of the infringement. *Id.* Consequently, the information sought by RFP No. 171 about expenses and profits that were *not* attributable to the infringement would not address Reinsdorf's need to show a causal nexus and thus would not necessarily have assisted Reinsdorf in his effort to oppose Skechers' motion.

 RFP Nos. 179 and 180 seek, respectively, documents reflecting sales of products "attributable to [Skechers'] marketing efforts that used [Reinsdorf's] images" and, somewhat redundantly, that show "the impact" that Skechers' marketing efforts using

Reinsdorf's images had on sales.[10] (Briggs Decl., Dkt. No. 159.6, Exh. 42 at 677). Skechers objected to the requests, but further responded that "to the extent [these] Request[s] can be understood, Skechers has no responsive documents." (*Id.,* Exh. 43 at 693–94, Dkt. No. 159.7). Similarly, RFP Nos. 182–189 seek documents reflecting the "impact [Skechers'] marketing efforts that used [Reinsdorf's] images had on sales" of specific Skechers product lines (Cali, Men's USA, Women's USA, Men's active, Women's Active, Men's Sport, Women's Sport and Shape Ups). (Briggs Decl., Exh. 42 at 677–79, Dkt. No. 159.6). Skechers objected to the requests, but further responded that "to the extent [these] Request[s] can be understood, Skechers has no responsive documents." (*Id.,* Exh. 43 at 694–99, Dkt. No. 159.7). All of these requests appear predicated on the assumption, which Skechers contests, that Reinsdorf's photographs had an "impact" on Skechers' sales that Skechers could isolate and identify independent of any other reason for sales.

Skechers' marketing expert, Dominique Hanssens, represented under oath that Skechers does not compile "revenue stream variability data." (Declaration of Dominique Hanssens in support of Skechers' Motion in Limine to Exclude Expert Testimony from Jamie Turner, Dkt. No. 128.2, at 5–6). Reinsdorf contends that Skechers' assertion is false, *i.e.,* that it was a fraudulent representation to state that Skechers does not maintain product line sales data. Reinsdorf further contends this false statement misled his attorneys and caused them to refrain from filing a motion to compel. (Supp. Memo. at 13–14). However, a fair reading of Hanssens' declaration does not support Reinsdorf's interpretation. Hanssens explains that "variability data" is not the same thing as product-line data and that by noting that Skechers does not compile variability data, he did not mean that Skechers does not maintain "overall company product-line data." (Hanssens Decl. ¶ 12). According to Hanssens, "variability data" would track "dif-

10. Similarly, topic 13 of Reinsdorf's Notice of 30(b)(6) Deposition of Skechers U.S.A., Inc. sought information about Skechers' revenues and profits "attributable to Skechers' marketing

campaigns." (Declaration of Drew E. Breuder in support of Skechers' Motion to Compel further Responses and for Protective Order, Exh. 8 at 55, Dkt. No. 89.1)

ferent conditions of consumer exposure to marketing images" that did and did not use Reinsdorf's images. (*Id.*). Hanssens further explains that product-line data, which simply tracks the amount of sales, does not reveal the conditions of marketing exposure that drive the sales. (*Id.*). If Reinsdorf was confused about what Hanssens meant by "variability data," he had the opportunity to depose Hanssens but chose not to do so. (Welsh Decl. ¶ 16). Reinsdorf cannot now impute his confusion to malfeasance on Skechers' part. Consequently, Reinsdorf has failed to show that Skechers made any material misrepresentation about the existence of product line data.

More fundamentally, RFP Nos. 179–80 and 182–89 appear to seek documents reflecting the discrete "impact" that Reinsdorf's photographs had on Skechers' sales, independent of any other sales drivers, as opposed to overall raw sales data of particular product lines. Reinsdorf argues that the "simplest and most obvious way to measure the 'impact' of an advertisement on 'sales' is to measure the sales of the product being advertised before the advertisement runs versus the sales after the advertisement ran." (Supp. Memo. at 15). However, that interpretation of the requests, while conceivably possible, is not obvious or inevitable. As Hanssens explained, overall sales data does not isolate the "impact" that Reinsdorf's images alone had on sales because such data does not control for other concurrent reasons for sales. Moreover, the fact that Reinsdorf was aware of the scope of Skechers' productions but did not seek to compel production of product line sales data suggests that Reinsdorf did not believe such information was required to meet his burden under *Polar Bear*. Reinsdorf insisted in his Opposition to Skechers' underlying Motion for Summary Judgment that he "repeatedly requested from Skechers data and information to determine profits earned by Skechers attributable to its use of his photographs," including "sales information on specific Skechers products." ("MSJ Opp.," Dkt. No. 149, at 26). However, none of the requests clearly asked for overall product line sales data, and it appears that counsel who drafted Reinsdorf's Opposition believed such data was not necessary to prove Reinsdorf's case. Reinsdorf argues in his MSJ Opposition that when the defendant in a copyright action fails or refuses to produce evidence of net sales or profits from specific product lines, "the court may rely on indirect or circumstantial evidence and the plaintiff need only establish a basis for a reasoned conclusion." (*Id.*). Reinsdorf cited to public statements by Skechers' CEO and COO linking Skechers' profits to its marketing success, and argued that because Reinsdorf provided images for "approximately 58% to 60% of Skechers' product lines, which account for approximately 77% of the company's revenues during the applicable period," it was reasonable to conclude that Reinsdorf's images "contributed to the net profits of Skechers between 50% to 75% of net profits." (*Id.* at 32). Reinsdorf evidently believed that his burden could be met by indirect sources of proof. That the Court disagreed is not the result of any alleged discovery misconduct by Skechers.

 In sum, Skechers produced responsive financial information in response to Reinsdorf's discovery requests and Reinsdorf's very experienced counsel was aware of the scope of those productions. If Reinsdorf needed more specific information, it was incumbent on him to either move to compel or to draft more specific production requests. In addition, if Reinsdorf suddenly realized at the summary judgment stage that he needed more information, he could have brought a motion to take additional discovery under Rule 56(d)(2), but he did not do so. Reinsdorf had sophisticated counsel and is bound by counsel's strategic decisions. *See Matrix Motor Co., Inc.*, 218 F.R.D. at 676; *Hussain*, 435 F.3d at 364. Reinsdorf has not shown that Skechers' responses to his discovery requests were improper.

**B.** *Rule 26 And The Assertion Of Skechers' Fifteenth Affirmative Defense Did Not Require Production Of Differentiated Sales Data*

 Reinsdorf argues that independent of the requests for production discussed above, Skechers had an affirmative duty under Rule 26 to produce product line sales data. (Supp. Memo. at 15). Skechers' Rule 26(a) Initial Disclosures identified as a cate-

gory of documents that "may be used" in the litigation "[d]ocuments and correspondence related to the facts, allegations, claims and defenses referenced in the operative pleadings." (Ruga Decl., Exh. 4 at 34–35). Skechers' Fifteenth Affirmative Defense asserted that Reinsdorf's claims for monetary damages are "barred because the requested monetary relief is too speculative and/or remote and/or impossible to prove and/or to allocate."[11] (Second Amended Answer, Dkt. No. 57, at 15). According to Reinsdorf, the assertion of this defense therefore triggered an obligation to disclose and produce product line sales data. (Supp. Memo. at 15–17). In addition, Reinsdorf argues that Skechers was required to produce product line sales data pursuant to RFP Nos. 1 and 16, which respectively sought all documents identified in Skechers' Initial Disclosures and that related to Skechers' Fifteenth Affirmative Defense. (*Id.* at 15).

Rule 26 (a)(1)(A)(ii) requires each party to produce or disclose "without awaiting a discovery request" all documents or electronically stored information that the party "may use to support its claims or defenses, unless the use would be solely for impeachment." In addition, Rule 26(e) imposes on the parties a duty to supplement their disclosures. The automatic disclosure obligation prevents a party from "obstruct[ing] production of the very documents that it would use to support its case and then unveil[ing] those documents at trial or in response to a dispositive motion." *Milliken & Co. v. Bank of China*, 758

F.Supp.2d 238, 245 (S.D.N.Y.2010); *see also Robert Kubicek Architects & Assocs. Inc. v. Bosley*, 2013 WL 998222 at *1 (D.Ariz. Mar. 13, 2013) (the purpose of Rule 26(a)(1)(A)(ii) "is not merely to apprise the opposing party of the existence of documents; it is to tell the opposing party which documents may be used at trial").

As explained in the Advisory Committee Notes to Rule 26, "[the] disclosure obligation attaches both to witnesses and documents a party *intends to use* and also to witnesses and to documents the party *intends to use* if—in the language of Rule 26(a)(3)—'the need arises.'" Fed.R.Civ.P. 26(a)(1), Advisory Comm. Notes, 2000 Amendment (emphasis added). However, as the Advisory Committee further explained, pursuant to the 2000 amendments, "[a] party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, *that it does not intend to use.*" *Id.* (emphasis added); *see also Yaccarino v. Motor Coach Indus., Inc.*, 2006 WL 5230033 at *6 (E.D.N.Y. Sept. 29, 2006) ("That [certain documents] might be useful to *plaintiffs* in proving their claims does not trigger [defendant's] obligation of automatic disclosure under Rule 26.") (emphasis in original); *Ruddell v. Weakley County Sheriff's Dep't*, 2009 WL 7355081 at *1 (W.D.Tenn. May 22, 2009) ("The plain language of the Rule makes clear that the disclosing party must only disclose materials if *that party* intends to use the materials to support its claims or defenses.")

---

11. In fact, as Skechers admitted at the hearing, Skechers' Fifteenth Affirmative Defense is not an "affirmative defense" at all. An affirmative defense "plead[s] matters extraneous to the plaintiff's prima facie case, which deny plaintiff's right to recover, even if the allegations are true." *Federal Deposit Ins. Corp. v. Main Hurdman*, 655 F.Supp. 259, 262 (E.D.Cal.1987); *see also In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir.1988) ("An affirmative defense raises matters extraneous to the plaintiff's *prima facie* case; as such, they are derived from the common law plea of 'confession and avoidance.'") (internal quotation marks omitted). However, "[a] defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense." *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir.2002); *see also Rawson Food Service*, 846 F.2d at 1349 (defenses which merely "negate an element of the plaintiff's prima facie case ... are excluded from the

definition of affirmative defense in Fed.R.Civ.P. 8(c)") (internal quotation marks omitted).

The defendant "bears the burden of proof as to each element of an affirmative defense." *Tovar v. U.S. Postal Service*, 3 F.3d 1271, 1284 (9th Cir.1993). However, the Ninth Circuit has clearly held that "it is the duty of the copyright plaintiff to establish a causal connection between the infringement and the gross revenue reasonably associated with the infringement." *Polar Bear Productions, Inc.*, 384 F.3d at 715. Skechers' Fifteenth Affirmative Defense merely asserts that Reinsdorf cannot meet his burden to establish the requisite causal connection but does not provide a reason, based on matters extraneous to the elements of Reinsdorf's claim, why Reinsdorf would still not be entitled to the damages he seeks even if he could meet his burden under *Polar Bear*. Because Skechers' Fifteenth Affirmative Defense is not actually an affirmative defense, Skechers was not required to plead it.

(emphasis in original). Accordingly, even if a party possesses evidence relevant to its claims or defenses, the party is not required to disclose it under Rule 26 if the party does not intend to use the evidence to support its claims or defenses. *See Columbia Data Products, Inc. v. Autonomy Corp. Ltd.*, 2012 WL 6212898 at \*2 (D.Mass. Dec. 12, 2012) ("[E]ven if an individual has personal knowledge of facts relevant to the parties' claims and defenses, a party is not obligated to disclose the individual if the party does not intend to use the individual to support its claims or defenses."); *Gomas v. City of New York*, 2009 WL 962701 at \*2 (E.D.N.Y. Apr. 8, 2009) (automatic disclosure rule does not inquire whether information is discoverable, but whether a responding party intends to use it to support its claims or defenses).

■ Accordingly, Skechers' inclusion in its Initial Disclosures of documents related to "defenses referenced in the operative pleadings" did not require the production of product line sales data unless Skechers intended to use that data in this litigation, which clearly it did not. Therefore, Rule 26 did not impose a duty on Skechers to disclose the existence of such data or to produce it independent of a discovery request.

Additionally, even construing RFP No. 16 as calling for all documents "related" to Skechers' assertion that Reinsdorf's damages claim was too speculative, whether or not Skechers intended to use such documents at trial, the request cannot be fairly construed to require the production of product line sales data. Skechers' Fifteenth Affirmative Defense is an assertion that evidence does not exist to support Reinsdorf's damages claims. Interpreting RFP No. 16 to require Skechers to produce documents to support that assertion is asking Skechers to prove a negative. That is an unfair burden as it would require Skechers to review seemingly every financial document in the company to consider whether the document or data might be helpful to Reinsdorf in some fashion, including uses that might never have been imagined by Reinsdorf. Skechers was not obligated to do Reinsdorf's work for him. If Reinsdorf determined that he required specific kinds of data to support his damages claims, he needed to request that data in a clear, straightforward manner.

## C. *Skechers' Production Of The Aggregate Data In Skechers' General Ledger Sufficiently Responded To Reinsdorf's Request*

The other financial information at issue in Reinsdorf's Motion for Relief and Reconsideration is Skechers' production of its General Ledger. (Supp. Memo. at 25–27). As noted above, Skechers produced its General Ledger in response to RFP No. 171, which sought "[a]ll documents that evidence, support, relate or refer to [Skechers'] deductible expenses and/or elements of profit from 2006 until the present that [Skechers] contend[s] are attributable to factors other than [Skechers'] alleged infringements of photographs taken by Reinsdorf." (Briggs Decl., Dkt. No. 159.4, Exh. 40 at 650). Because Skechers contended that all of its profits were attributable to factors other than its alleged infringing uses of Reinsdorf's photographs, Skechers objected to the request as overbroad and unduly burdensome, but ultimately agreed to produce its General Ledger. (Welsh Decl., Exh. D at 200). Reinsdorf acknowledges that Skechers produced the aggregate, "rolled up" numbers, but argues that Skechers' production was deficient because it did not include the subledgers containing detailed underlying information, including product line sales data. (Supp. Memo. at 25–27).

The Parties dispute whether a "General Ledger," as a term of art, necessarily includes subledgers. (*See* Supp. Memo. at 26; Opp. at 17). According to Reinsdorf's accounting expert, Peter A. Salomon, subledgers are "a necessary part of the general ledger." (Salomon Decl. ¶ 17). Salomon states that without subledgers reflecting Skechers' revenues and costs, "the full scope and details of Skechers' transactions cannot be analyzed." (*Id.*). In contrast, Skechers' accounting expert, Neill W. Freeman, states that "subsidiary ledgers are considered to be *separate* ledgers that are *supportive* of the balances in the general ledger" but are not viewed in the industry as "part of the general ledger." (Freeman Decl. ¶ 12) (emphasis in original). In addition, Skechers emphasizes that its general ledger and subledgers use different software programs that do not com-

municate with each other. (Primeaux Decl. ¶ 4).

█ It is not necessary for the Court to resolve this battle of the experts to determine the primary issue before it, *i.e.*, whether the aggregate data in Skechers' general ledger sufficiently responded to Reinsdorf's discovery request for costs and expenses that Skechers contended were attributable to factors other than the alleged infringement. The Court finds that it did. RFP No. 171 did not request product line sales information. In fact, no request specifically sought differentiated sales information. Skechers represents that it produced its general ledger "out of an abundance of caution in the event Skechers' summary judgment motion was denied and Skechers found itself having to prove up its deductible expenses and costs at trial." (Opp. at 16). Applying the rules of reasonableness and proportionality, the Court finds that Skechers' production of its general ledger of aggregate data was objectively reasonable. According to the declarations of both Reinsdorf's and Skechers' accounting experts, Skechers' general ledger contained 4,944,684 rows of data for the years 2007 through 2010 and up to thirteen fields of data. (Solomon Decl. ¶ 6; Freeman Decl. ¶ 9). It is likely that Skechers' combined subledgers would be at least as massive as the general ledger, if not larger.[12] Skechers could not be reasonably expected to produce such vast quantities of data absent a more specific request. Importantly, Reinsdorf had the ability and resources to consult an expert long before Skechers moved for summary judgment and Reinsdorf could easily have moved to compel the subledgers, if

Reinsdorf believed the subledgers were responsive to Request No. 171. He did not. Once again, Reinsdorf is bound by the decisions of his prior counsel and cannot use those decisions, now that he disagrees with them, as a basis to reopen discovery. *See Matrix Motor Co., Inc.*, 218 F.R.D. at 676; *Hussain*, 435 F.3d at 364. Because Reinsdorf's discovery requests did not specifically request product line sales data or subledgers and Reinsdorf did not move to compel the production of such data, Skechers could reasonably conclude that the aggregate data it produced appropriately responded to RFP No. 171 and was sufficient to show its costs and profits.[13]

In sum, the Court finds that Skechers did not misrepresent the financial data it maintained nor did Skechers improperly withhold information that it was required to produce in response to Reinsdorf's discovery requests or pursuant to its disclosure obligations under Rule 26. Accordingly, Reinsdorf has failed to establish grounds to re-open discovery on these contentions.

## V.

## SKECHERS DID NOT MISREPRESENT THE EXISTENCE OF MARKETING DOCUMENTS

Reinsdorf argues that Skechers fraudulently represented that it does not have marketing plans, which Reinsdorf claims would be relevant to both liability (to show infringing uses), and damages (to show a causal nexus between infringements and sales). (Supp. Memo. at 17). Reinsdorf argues that

---

**12.** Skechers' general ledger includes product-line information for non-branded footwear for which Skechers is required to pay royalties. (Freeman Decl. ¶ 9). Although Skechers states that there are "very few footwear products not branded as Skechers," (Primeaux Decl. ¶ 5), only 1,375,275 rows of the 4,944,684 total rows of data in the general ledger concern non-branded footwear products. (Freeman Decl. ¶ 9). As such, it is reasonable to conclude that the subledgers kept in a separate database that reflect product-line sales of Skechers-branded footwear would in fact be much more voluminous than the general ledger.

**13.** The Court further notes that Reinsdorf's apparent purpose in serving RFP No. 171 was not

to seek evidence to establish a causal nexus, but to prevent surprise at trial by Skechers' evidence of its deductible costs and expenses. At the January 26, 2012 hearing, Reinsdorf stated in reference to RFP No. 171 and Deposition Topics 13 and 14 that "if the defendant does not want to put on any proof at trial of what it purports its deductible expenses to be, that's fine with the plaintiff. We just don't want to be surprised at trial." (Welsh Decl., Exh. D at 177). This open court admission further supports the reasonableness of Skechers' production as Reinsdorf did not state that he desired detailed product-line data, but indicated that he simply wanted the evidence that Skechers would rely on to prove its costs and expenses at trial.

the 2011 Advertising PowerPoint and the 2011 Marketing Expectations Memo, which Reinsdorf downloaded from Skechers' Media Share Website, undermine Skechers' contention that it has no marketing plans. (*Id.* at 19–20). Reinsdorf further argues that the 2011 Advertising PowerPoint and 2011 Marketing Expectations Memo show that Skechers misrepresented that it does not track the effectiveness of its marketing campaigns on sales. (*Id.* at 21–23). According to Reinsdorf, the 2011 Advertising PowerPoint shows that Skechers required its affiliates to provide it with detailed information about their print advertising, including "contact information to track effectiveness." (*Id.* at 23) (quoting Ruga Decl., Exh. 7 at 82). Similarly, Reinsdorf argues that the 2011 Marketing Expectations Memo required Skechers affiliates to submit monthly reports discussing "any specific techniques [the affiliate] used and how effective they were" and if local GWP [gift with purchase] or POP [point of purchase] items "were effective." (Supp. Memo. at 23) (quoting Ruga Decl., Exh. 9 at 108). Finally, Reinsdorf contends that information available on third party websites, *i.e.*, an article quoting a Skechers executive and a promotional release, show that Skechers both tracked the effectiveness of marketing on its internet sales and did so by hiring marketing companies to help it "maximize return on its advertising spend for its retail website." (*Id.* at 23–25; Ruga Decl., Exh. 10 at 110; *id.*, Exh. 11 at 112).

## A. *Reinsdorf Has Not Shown That Skechers Failed To Produce Any Relevant Marketing Plans*

The Court finds that Reinsdorf has failed to establish that Skechers had any overall Marketing Plans or that it failed to produce any material marketing plans that involved his photographs. In the first instance, Skechers did not represent that it had no marketing documents. Instead, Skechers simply stated that it did not have a formal "Marketing Plan," as Reinsdorf's RFP No. 145 specifically requested. (Opp. at 19). RFP No. 145 asked for all documents constituting or relating to Skechers' "Marketing Plan for 2006, 2007, 2008, 2009 and 2010." (Welsh Decl., Exh. M at 596). In its response to RFP No. 145, Skechers objected

on several grounds but also stated that it would "meet and confer with plaintiff to address how this Request may ... be limited and/or clarified to seek documents that are relevant to the claims or defenses in this litigation." (*Id.*). Skechers did not state that it did not have any marketing documents or marketing plans. In addition, at a hearing on January 26, 2012, counsel for Skechers stated:

> There is a difference between having a marketing plan and having a document that is called a "marketing plan." Skechers very clearly has marketing plans, and those marketing plans are evidence in the documents we are proposing to produce to the plaintiff.... [¶] [W]e have likewise represented multiple times to the plaintiff that documents relating to Skechers' marketing efforts that pertain to any of the images that we understand are at issue in this lawsuit are being produced.

(Welsh Decl., Exh. A at 21–22).

Skechers has credibly explained why the company does not have an overall Marketing Plan. David Weinberg, Skechers' CFO and COO, explained that Skechers' marketing strategy is to promote footwear products that consumers have already indicated that they want as opposed to create initial consumer interest. (Weinberg Decl. ¶ 5). Skechers therefore "continually adjusts its advertising throughout the year based on its assessment of the footwear products and styles that consumers have found attractive...." (*Id.*). Furthermore, while the 2011 Advertising PowerPoint does refer to "media plans," (Ruga Decl., Exh. 7 at 55–69), and "International Marketing Materials Procedures," (*id.* at 84–97), the document merely describes procedures for getting media plans (which specify the medium to be used to reach a target audience) and marketing images approved. (Opp. at 24). The 2011 Advertising PowerPoint does not appear to present a substantive "marketing plan" discussing specific products, prices, and distribution, which one would expect from a marketing plan. (*See* Hanssens Decl. ¶¶ 17–18). Additionally, the 2011 Advertising PowerPoint does not involve or refer to Reinsdorf's photographs, and therefore is not within the scope of mar-

keting documents Skechers agreed to produce. (Opp. at 25). Skechers represents that it produced 2,400 pages of marketing "'usage' documents evidencing how, when, and where the marketing images containing Reinsdorf's photographs were utilized by the company...." (Opp. at 22). Reinsdorf did not renew his motion to compel further responses to RFP No. 145 following the production of these documents, which strongly suggests that he was satisfied with the production. (Welsh Decl. ¶ 18).

Furthermore, the 2011 Marketing Expectations Memo, which refers to "monthly marketing reports," is not itself a "marketing plan" and does not reflect the existence of any prospective "marketing plan." (Opp. at 26). Rather, as John David Moody, Skechers' International Marketing Manager, explained, the 2011 Marketing Expectations Memo was intended to standardize the format, style and content of monthly marketing reports from Skechers' third party international distributors, subsidiaries and joint venture partners. (Moody Decl. ¶ 11). Like the 2011 Advertising PowerPoint, the 2011 Marketing Expectations Memo does not mention Reinsdorf or his photographs, and thus is not within the scope of documents Skechers agreed to produce. (Opp. at 27). In addition, the monthly marketing reports, which in contrast did involve Reinsdorf's photographs, were retrospective as they discussed marketing initiatives these affiliates conducted during the prior month and thus are not "marketing plans." (*Id.* ¶ 12). Reinsdorf in fact questioned Moody about the contents of monthly marketing reports during his deposition. (*See* Welsh Decl., Exh. I at 442–46). Furthermore, Skechers produced the monthly reports during discovery. (Moody Decl. ¶ 12 & *id.*, Exh. C).

In sum, Reinsdorf has failed to show that Skechers had a formal "Marketing Plan" that a reasonable party would have believed was responsive to Request No. 145 or that Skechers failed to produce any relevant, material "marketing plans" that involved Reinsdorf's images. Therefore, Reinsdorf's contentions regarding Skechers' alleged failure to produce its "marketing plans" do not warrant the re-opening of discovery.

**B.** *Reinsdorf Has Not Shown That Skechers Failed To Produce Relevant Documents Tracking The Effectiveness Of Marketing On Sales*

The Court further finds that Reinsdorf's claim that Skechers misrepresented the existence of documents showing the effectiveness of Skechers' advertisements on sales overstates the evidence. Reinsdorf's evidence consists of the 2011 Advertising PowerPoint and the 2011 Marketing Expectations Memo's isolated references to the word "effective" or "effectiveness," and references to Skechers' return on marketing spend from third party websites discussing Skechers' internet advertising. However, Skechers convincingly showed that Reinsdorf's evidence is taken out of context or is based on a misunderstanding of the facts. Reinsdorf has not shown that relevant documents exist that track the direct impact of a particular marketing campaign on Skechers' sales, much less that show how Reinsdorf's photographs were the cause of an increase or decrease in any of Skechers' sales.

The 2011 Advertising PowerPoint describes, in part, the procedures to be followed by Skechers' affiliates regarding "advertorials," which are features in fashion magazines that highlight certain products. (Clay Decl. ¶ 13). The procedures include directives on what the magazine page showcasing Skechers' products must include: the word "SKECHERS" with shoe names, "copy relating to a trend," and "contact information to track effectiveness." (Ruga Decl., Exh. 7 at 82). However, Jennifer Clay, Skechers' Vice President of Corporate Communications, explained that "[t]he contact information that we ask subsidiaries to place on any advertorials is clearly not intended to allow the subsidiaries or Skechers to make any quantitative assessment as to whether particular advertorials resulted in any increases in footwear sales. Instead, we ask that subsidiaries include this contact information on the advertorial to ensure that consumers have the information they need to find the footwear featured in the advertorial." (Clay Decl. ¶ 14).

Similarly, the 2011 Marketing Expectations Memo directs Skechers' international

subsidiaries to include in their monthly marketing report "a brief overview of any specific techniques that you used and how effective they were." (Ruga Decl., Exh. 9 at 108). For local gift with purchase or point of purchase items, the Memo directs the affiliate to show the image on a slide and "explain if [the GWP or POP initiatives] were effective." (*Id.*). However, as Moody, who wrote the 2011 Marketing Expectations Memo explains, the references to "effectiveness" seek information about "whether the marketing technique being employed by the distributor created more brand awareness, press, or publicity. [The references do] not refer to whether those marketing initiatives were 'effective' from a sales standpoint." (Moody Decl. ¶ 13). Moody includes a sample marketing report in support of that contention which discusses marketing activities during a local festival, including the number of festival goers, the number of Skechers coloring books painted by children, prize giveaways and media coverage. (*Id.*, Exh. D). Therefore, it appears that Moody's use of the adjective "effective" called for subjective descriptions of how successful marketing efforts were in promoting brand awareness, not statistics about their direct influence on sales.

Finally, Reinsdorf has not shown how Skechers' internet marketing is relevant to his suit. Reinsdorf cites to an article in which a Skechers executive discusses the return on ad spend for a selected group of internet advertisements. (Ruga Decl., Exh. 10). Reinsdorf further cites to a promotional release disseminated by AudienceScience, Inc. which indicates that Skechers hired AudienceScience to help it to "maximize return on its advertising spend for its retail website." (Ruga Decl., Exh. 11 at 112). AudienceScience states that it helped Skechers achieve an 827% return on Skechers' ad spend for a particular advertising campaign. (*Id.*). Reinsdorf contends that his photographs were "used by Skechers in pop-up advertising" and therefore were subject to effectiveness tracking. (Supp. Memo. at 25). However, according to Timothy Lakin, Skechers' Ecommerce Merchandising Manager, the images Reinsdorf submits in support of this contention were not used in pop-up ads because "Skechers has never used pop-up advertising." (Lakin Decl. ¶ 4). Lakin further states that while Skechers does use display ads, "Skechers has never used marketing images containing any of Reinsdorf's photographs in display ads." (*Id.* ¶ 6). Lakin confirms that the images submitted by Reinsdorf were used by Skechers as "filler" or for informational or promotional giveaway purposes on Skechers' own website, Skechers.com. (*Id.* ¶ 7). However, because Skechers does not maintain "click-through" data to monitor whether a consumer clicked on a particular image prior to making a purchase on Skechers.com, it does not have data tracking the impact of Reinsdorf's photographs on sales.[14] (*Id.; see also* Irving Decl. ¶¶ 8–10). Reinsdorf has not shown that his photographs were used in any internet advertising apart from their use on Skechers.com.

Finally, Lakin states that Skechers does not hire third party marketing companies to maximize return on advertising spend for Skechers.com. (Lakin Decl. ¶ 10). Rather, Skechers uses third party companies that manage advertising networks to "place Skechers' display ads" on other websites that are visited by persons who came to Skechers.com but did not make a purchase (so-called "lost conversions"). (*Id.*). However, the return on ad spend cited in the promotional release, and the article attached as Exhibit 10 to the Ruga Declaration, in which Laura Christine, Skechers' Vice President of Direct Marketing and E-commerce, is quoted, suggest that with respect to internet marketing, Skechers tracked its return on ad spend at least on some level. (Ruga Decl., Exh. 10 at 110) (quoting Christine for the proposition that Skechers "achieved a 283% return on ad spend" for a "select group of campaigns" on the web).

Therefore, to the extent that Skechers represented in absolute terms that it "has never sought to assess the impact, if any, that its various types of marketing or advertising have had on Skechers' sales generally or on sale of specific lines of footwear," the repre-

14. Lakin notes that the total revenues from all sales on Skechers.com, whether or not from "lost conversions," is no more than one percent of Skechers' total sales. (Lakin Decl. ¶ 11).

sentation may have been inaccurate. (Skechers' MSJ Reply, Dkt. No. 183, at 29 n. 25). It is certainly plausible that the link between internet sales and specific marketing campaigns may be quantifiable in ways that other sales are not. (*See, e.g.,* Weinberg Decl. ¶ 6) (discussing concurrent drivers of in-store sales that would make attribution to particular marketing efforts difficult, even if Skechers tried to collect such data). However, revenues from Skechers.com, whether from "lost conversion" purchases or from consumers going directly to the site, are an extremely small percentage of Skechers' business, which may account for any omission. (Lakin Decl. ¶ 11). More importantly, even accepting Reinsdorf's argument that Skechers compiles data concerning marketing effectiveness on internet sales and failed to disclose that fact, whether through inadvertence or design, Reinsdorf has failed completely to show how such data would ultimately be material in this case. Reinsdorf's photographs were used only on Skechers' own webpage, and Skechers does not compile click-through data for purchases on that site. (Lakin Decl. ¶ 7; Irving Decl. ¶¶ 8–10). Therefore, Skechers accurately represented that it does not have data tracking the impact of Reinsdorf's photographs on sales on Skechers.com.

Finally, Reinsdorf cannot plausibly claim that he was unaware of Skechers' use of third party ad network vendors during discovery because he served a document subpoena on AudienceScience on February 6, 2012, prior to the close of discovery. (Welsh Decl. ¶ 23). Consequently, even though AudienceScience evidently did not produce any documents in response to Reinsdorf's subpoena, (*id.*), if Reinsdorf truly believed that evidence regarding Skechers' internet marketing was important to his indirect profits case, he could have filed a timely motion to compel against AudienceScience. In addition, the article in which Christine discusses the percentage return of ad spend on certain internet sales is dated June 19, 2009 and is not "new evidence." (Ruga Decl., Exh. 10 at 110). Reinsdorf pointedly identified Christine by name as someone who was "responsible to execute an aggressive, strategic marketing plan for Skechers" during a meet and confer with Skechers on January 31, 2012. (Welsh Decl., Exh. B at 71). Reinsdorf also could have sought to depose Christine if internet marketing were crucial to his case. However, Reinsdorf's counsel neither followed up on the AudienceScience discovery nor deposed Christine. (Opp. at 31 n. 29). Again, Reinsdorf is bound by the strategic choices his prior counsel made regarding discovery. *See Matrix Motor Co., Inc.,* 218 F.R.D. at 676; *Hussain,* 435 F.3d at 364.

In sum, Reinsdorf has failed to show that Skechers possessed but did not produce any relevant, material information tracking the effectiveness of Reinsdorf's images on Skechers' sales. Nor has Reinsdorf shown that Skechers withheld documents that were responsive to a reasonable construction of Request for Production No. 145. Therefore, this ground does not warrant re-opening discovery.

# VI.

## REINSDORF FAILS TO SHOW SPOLIATION

Reinsdorf maintains that between April 2012 and March 2013, Skechers "willfully spoliated evidence from a website under its exclusive control that Skechers used to distribute, among other things, Reinsdorf's photographs around the world." (Supp. Memo. at 27; Rubin Decl. ¶¶ 7–11). Specifically, Reinsdorf states that Skechers deleted 89 folders and one stand alone file from its Media Share Website, which resulted in the loss of both documents and metadata, including evidence "crucial" to his case. (Supp. Memo. at 27).

### A. *Standard*

 Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence[,] in pending or reasonably foreseeable litigation." *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y.2003) ("*Zubulake IV*") (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)); *see also Silvestri v. Gen. Motors Corp.,* 271 F.3d 583, 590 (4th Cir.2001) (same). The authority to impose sanctions for spoliation arises from a court's inherent power to control the judicial process. *Medi-*

*cal Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 824 (9th Cir.2002). The exercise of a court's inherent powers must be applied with "restraint and discretion" and only to the degree necessary to redress the abuse. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *see also Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 79 (3rd Cir.1994) (courts should choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim"). Accordingly, the determination of an appropriate sanction for spoliation is "confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001) (internal citations omitted).

■■■■ "A trial court's discretion regarding the form of a spoliation sanction is broad, and can range from minor sanctions, such as the awarding of attorneys' fees, to more serious sanctions, such as dismissal of claims or instructing the jury that it may draw an adverse inference." *Apple, Inc. v. Samsung Electronics, Co., Ltd.*, 881 F.Supp.2d 1132, 1135 (N.D.Cal.2012) ("*Apple I*"); *see also Pension Comm.*, 685 F.Supp.2d at 469 ("The choices include—from least harsh to most harsh—further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal (terminating sanctions.)"). "The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West*, 167 F.3d at 779 (internal citations and quotation marks omitted). To decide which specific spoliation sanction to impose, courts generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 888 F.Supp.2d 976, 992

(N.D.Cal.2012) ("*Apple II*") (internal quotation marks omitted).

■■■■ The bare fact that evidence has been altered or destroyed "does not necessarily mean that the party has engaged in sanction-worthy spoliation." *Ashton v. Knight Transp., Inc.*, 772 F.Supp.2d 772, 799–800 (N.D.Tex.2011). To determine whether to impose sanctions for spoliation, the majority of courts, including many courts in this Circuit, apply "the three-part test set forth by Judge Scheindlin in *Zubulake IV* for determining whether to grant an adverse inference spoliation instruction." *Apple I*, 881 F.Supp.2d at 1138. According to *Zubulake IV*,

A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Zubulake IV*, 220 F.R.D. at 220 (citing *Residential Funding Corp. v. DeGeorge Fin'l Corp.*, 306 F.3d 99, 108 (2d Cir.2002)); *see also Apple II*, 888 F.Supp.2d at 989–90; *Surowiec v. Capital Title Agency, Inc.*, 790 F.Supp.2d 997, 1005 (D.Ariz.2011); *Lewis v. Ryan*, 261 F.R.D. 513, 521 (S.D.Cal.2009); *Rev 973 LLC v. Mouren–Laurens*, 2009 WL 273205 at *3 (C.D.Cal. Feb. 2, 2009); *cf. Victor Stanley v. Creative Pipe, Inc.*, 269 F.R.D. 497, 520–21 & App'x (D.Md.2010) (analyzing standards for spoliation sanctions by circuit). "After considering these factors, a court must then consider all available sanctions and determine the appropriate one." *Apple I*, 881 F.Supp.2d at 1138. The party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim. *Centrifugal Force, Inc. v. Softnet Communication, Inc.*, 783 F.Supp.2d 736, 740 (S.D.N.Y.2011).

■■■ The first factor a court will consider, the obligation to preserve evidence, "arises when the party has notice that the evidence

is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."[15] *Zubulake IV*, 220 F.R.D. at 216; *see also Fujitsu Ltd.*, 247 F.3d at 436. "When evidence is destroyed in bad faith (*i.e.*, intentionally or willfully), that fact alone is sufficient to demonstrate relevance." *Zubulake IV*, 220 F.R.D. at 220. "By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions." *Id.*

 However, to show relevance, "[i]t is not enough for the innocent party to show that the destroyed evidence would have been responsive to a document request." *Pension Comm.*, 685 F.Supp.2d at 467. Courts generally agree that "relevance" for spoliation purposes "is a two-pronged finding of relevance and prejudice" because "for the court to issue sanctions, the absence of the evidence must be prejudicial to the party alleging spoliation of evidence." *Victor Stanley*, 269 F.R.D. at 531; *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 616 (S.D.Tex.2010) ("Courts recognize that a showing that the lost information is relevant and prejudicial is an important check on spoliation allegations and sanctions motions.") (citing cases). The prejudice inquiry "looks to whether the [spoliating party's] actions impaired [the non-spoliating party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir.2006) (internal quotations and citations omitted); *see also Pension Comm.*, 685 F.Supp.2d at 467 ("The innocent party must also show that the evidence would have been helpful in proving its claims or defenses—*i.e.*, that the innocent party is prejudiced without that evidence.").

"Courts have not been uniform in defining the level of culpability—be it negligence, gross negligence, willfulness, or bad faith—that is required before sanctions are appropriate for evidence destruction." *Ashton*, 772 F.Supp.2d at 800 (citing *Victor Stanley*, 269 F.R.D. at 529–31). In the Ninth Circuit, "a party's destruction of evidence need not be in 'bad faith' to warrant a court's imposi-

tion of sanctions." *In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1066 (N.D.Cal.2006) (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993)). The Ninth Circuit has instructed that district courts may impose sanctions even against a spoliating party that merely had "simple notice of 'potential relevance to the litigation.'" *Glover*, 6 F.3d at 1329 (quoting *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991)). Nevertheless, "a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." *In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d at 1066–67.

For example, the Ninth Circuit has held that "[o]nly 'willfulness, bad faith, and fault' justify terminating sanctions." *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir.2007) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir.2003)). The Ninth Circuit has not clearly articulated the degree of culpability necessary to warrant an adverse inference instruction. *S.E.C. v. Mercury Interactive LLC*, 2012 WL 3277165 at *10 (N.D.Cal. Aug. 9, 2012). However, courts in this Circuit have found that an adverse inference instruction may be warranted where the destruction was either willful or grossly negligent. *In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d at 1078; *see also Lewis*, 261 F.R.D. at 521; *Karnazes v. County of San Mateo*, 2010 WL 2672003 at *2 (N.D.Cal. July 2, 2010) ("An adverse inference instruction may be appropriate where a party's bad faith or gross negligence has resulted in either the spoliation of evidence or failure to turn over relevant evidence.").

In addition, many courts in this Circuit, following *Zubulake IV*, have instructed that even the negligent destruction of evidence may, in the proper circumstances, warrant some form of sanction. The *Zubulake IV* court, citing the Second Circuit's decision in *Residential Funding Corp.*, found that "a 'culpable state of mind' for purposes of a spoliation inference includes 'ordinary negligence.'" *Zubulake IV*, 220 F.R.D. at 220;

---

**15.** It is undisputed that "the duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future

litigation." *Surowiec*, 790 F.Supp.2d at 1005 (internal citations and quotations omitted).

see also *Residential Funding Corp.*, 306 F.3d at 107 ("[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently.*'")(quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107–12 (2d Cir.2001) (brackets and emphasis in original)). According to the *Residential Funding Corp.* court, the negligent destruction of evidence may be sanctioned because "each party should bear the risk of its own negligence." *Residential Funding Corp.*, 306 F.3d at 108. As the court explained,

"It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss."

*Id.* (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991)).

Accordingly, many courts in this Circuit have adopted the reasoning of the *Zubulake IV* and *Residential Funding Corp.* courts and have similarly instructed that "[t]he 'culpable state of mind' includes negligence." *Lewis*, 261 F.R.D. at 521; *see also FTC v. Lights of America Inc.*, 2012 WL 695008 at *2 (C.D.Cal. Jan. 20, 2012); *Housing Rights Center v. Sterling*, 2005 WL 3320739 at *8 (C.D.Cal. Mar. 2, 2005); *Cottle–Banks v. Cox Communications, Inc.*, 2013 WL 2244333 at *14 (S.D.Cal. May 21, 2013); *Aguirre v. Home Depot U.S.A., Inc.*, 2012 WL 3639074 at *3 (E.D.Cal. Aug. 23, 2012); *Uribe v. McKesson*, 2010 WL 4235863 at *3 (E.D.Cal. Oct. 21, 2010); *Infor Global Solutions (Michigan), Inc. v. St. Paul Fire and Marine Ins. Co.*, 2009 WL 5909255 at *3 (N.D.Cal. Oct. 21, 2009). However, as noted above, "when the spoliating party was merely negligent, the innocent party must prove both relevance and prejudice in order to justify the imposition of a severe sanction." *Pension Comm.*, 685 F.Supp.2d at 467–68; *see also Zubulake IV*, 220 F.R.D. at 220; *Cottle–Banks*, 2013 WL 2244333 at *15–16 (negligent destruction of documents did not warrant adverse inference instruction or evidence preclusion where non-spoliating party failed to show relevance and thus was not prejudiced); *Apple II*, 888 F.Supp.2d at 993 (even where three-part spoliation test is satisfied, a court may deny request for adverse inference where degree of fault and level of prejudice were insufficient to justify the imposition of the sanction) (citing *Chin*, 685 F.3d at 161–62).

**B. Background Facts And The Parties' Contentions**

Reinsdorf took a screenshot of Skechers' Media Share Website on April 30, 2012. (Rubin Decl. ¶ 7). Later, on December 27, 2012 Reinsdorf made a copy of the contents of the Media Share Website. (*Id.* ¶ 8). A comparison of the April 30, 2012 screenshot and the December 27, 2012 download revealed that 68 folders and one file no longer resided on the website. (*Id.* ¶ 9). Reinsdorf returned to the site on March 8, 2013 and discovered that an additional 21 files that were still on the Media Share Website as of December 27, 2012 had been deleted. (*Id.* ¶ 10). However, because these 21 folders had been copied during the December 27, 2012 preservation, Reinsdorf was able to examine and quantify their contents. According to Reinsdorf, the 21 folders deleted between December 27, 2012 and March 8, 2013 contained approximately 128 files and totaled over 2,000 megabytes in size. (*Id.* ¶ 11).

On April 16, 2013, Skechers produced to Reinsdorf a hard drive containing what Skechers represented were the original copies of 61 of the missing documents. (*Id.* ¶ 12). Reinsdorf argues that this production is inadequate for several reasons. First, the titles of only 49 of the 61 documents produced on April 16, 2013 match the names of the previously deleted Media Share Website documents. (*Id.*). Furthermore, Reinsdorf contends that it is unlikely that the contents of even documents with matching names is identical. According to Reinsdorf, twelve of the documents with matching names were part of the December 27, 2012 preservation and thus permit a comparison. (*Id.* ¶ 13). Reinsdorf discovered that the 12 preserved folders contained 55 files. However, a com-

parison of those 12 folders with the 12 folders with the same names in the April 16, 2013 production revealed that only five of the 55 files in the December 27, 2012 preservation were included in the April 16, 2013 production. (*Id.* ¶ 14). In addition, Reinsdorf contends that even if Skechers were able to produce the original copies of all deleted documents, their deletion from the Media Share Website would still have resulted in the loss of important metadata that would indicate, among other things, who accessed the document and when. (Supp. Memo. at 28).

In addition to the 61 documents produced by Skechers on April 16, 2013, Skechers also provided Reinsdorf with descriptions of all but five of the deleted documents that it has yet to locate. (Opp. at 33). According to Skechers, the fact that it has been unable to locate a handful of documents does not mean that they were not produced because when copies of documents are posted to the Media Share Website, they are often given different names. (*Id.* at 32). Skechers further argues that it is doubtful that the documents that it has been unable to find are relevant because none of the documents it produced on April 16, 2013 or for which it provided descriptions are relevant to this lawsuit. (*Id.*). Skechers notes that even though Reinsdorf has "always" had 21 of the deleted documents, even Reinsdorf does not contend that any of them are relevant to his claims. (*Id.* at 32). In sum, Skechers contends that the Media Share Website documents are not relevant to Reinsdorf's claims but, even if they were, the majority of the Media Share Website documents have been produced to Reinsdorf.

According to Skechers, Reinsdorf's spoliation claim thus turns on a single document, the 2010 Marketing Binder, which was part of the December 27, 2012 preservation. (*Id.* at 34). The 2010 Marketing Binder contains, among other things, "photographs of bus wraps and point-of-purchase materials featuring photographs taken by Reinsdorf." (Welsh Decl. ¶ 36). The Binder was posted to the Media Share Website for use by Skechers' domestic and foreign sales representatives to "provide examples or illustrations of the type of marketing initiatives [Skechers] employed in the past and to create excitement for the sales representatives."

(Moody Decl. ¶ 16). According to Skechers, the 2010 Marketing Binder was "not the equivalent of a mail order catalog" and the inclusion of a photograph from a prior marketing initiative in the Binder did not necessarily mean that sales representatives could order copies of those specific materials for use in 2010. (*Id.*). Skechers admits that if it had identified the 2010 Marketing Binder as a separate responsive document, it would have produced it. Skechers did produce another document with the exact same name but different content. (Welsh Decl. ¶ 36). Skechers also notes that it produced other documents containing the same information as the 2010 Marketing Binder downloaded by Reinsdorf. (Opp. at 34) (citing Welsh Decl., Exhs. V, W, X & Y). Therefore, Skechers argues that its failure to produce the 2010 Marketing Binder did not prejudice Reinsdorf. (Opp. at 35–36). Finally, Skechers argues that because the Media Share Website contains only copies of documents, Skechers was not obligated to preserve documents posted there and their deletion cannot "constitute spoliation as a matter of law." (*Id.* at 32).

## C. *Reinsdorf Fails To Show The Relevance Of The Deleted Documents And Was Not Prejudiced By Their Deletion*

■■■■■ It is undisputed that the documents at issue in Reinsdorf's spoliation claim were deleted from Skechers' Media Share Website after Skechers was under a duty to preserve. However, a party is only required to retain "all *relevant* documents (but not multiple identical copies) in existence at the time the duty to preserve attaches, and any *relevant* documents created thereafter." *Zubulake IV*, 220 F.R.D. at 218 (emphasis added). As is discussed in more detail below, the Court finds that nearly all of the deleted documents appear to have had no relevance to the claims and defenses in this action. Therefore, Skechers had no duty to preserve them. Furthermore, the Court finds that the deletion of any arguably relevant documents, including the 2010 Marketing Binder, was at most negligent. Because the Court is satisfied that Reinsdorf was not prejudiced by their deletion, Reinsdorf's requests for a forensic examination of Skechers' servers and

an evidentiary hearing to further explore Skechers' alleged spoliation must be denied. The Court concludes that Reinsdorf's spoliation claim does not warrant re-opening discovery.

Skechers' Media Share Website is a "transmittal device used for the transitory hosting and staging of large electronic files." (Irving Decl. ¶ 3). Copies of documents created and stored elsewhere in the company are loaded by the user to a new folder on the Media Share Website, for the purpose of sharing the information or images. (*Id.* ¶ 4). Because the Media Share Website does not contain original content, Skechers does not image or make back-up copies of the data stored on the site. (*Id.* ¶ 5). Moody states that he "routinely remove[s] copies of outdated marketing images from Media Share as part of [his] responsibilities to make sure that Skechers' international distributors were only provided the current approved marketing images." (Moody Decl. ¶ 17).

Skechers' production of 61 documents that were the originals of documents deleted from the Media Share Website revealed that none of those documents were relevant to this lawsuit because they did not use or have any connection to Reinsdorf's photographs. That production consists of: twelve documents relating to Skechers' celebrity marketing initiatives; nine documents relating to Skechers' lines of children's shoes; three documents relating to BOBS, Skechers' charitable contribution program; six documents relating to Skechers' GOrun shoes and marketing campaigns; seventeen fitness-related videos or documents relating to the videos; six press releases and conference presentations; and eight miscellaneous documents that did not reference or include photographs taken by Reinsdorf. (Breuder Decl. at 2–7). Furthermore, the documents for which Skechers provided a description include three blank folders; thirteen documents with dates that postdate Reinsdorf's last photo shoot for Skechers by many months or years; two documents relating to celebrity marketing; and one document each relating to Skechers' Tone-up shoes and GOrun campaign, which did not involve Reinsdorf's photographs. (*Id.* at 7–8). In addition, Skechers confirmed that the document entitled "2010_Marketing-Binder/" refers to the 2010 Marketing Binder

at issue in Reinsdorf's Motion. (*Id.* at 7). Finally, Reinsdorf admits that he has two of the other deleted documents not accounted for in Skechers' April 16, 2013 production or descriptions, which, according to Skechers, means that 85 of the 90 deleted folders and files have been accounted for. (*Id.* at 8) (citing Dkt. No. 271.24, Declaration of Samuel S. Rubin ¶¶ 8–10).

Although Reinsdorf maintains that he "will never know what was contained in many of the hundreds of files that Skechers deleted after April 2012," it is readily apparent that the vast majority of the deleted documents had nothing to do with Reinsdorf's photographs. (Supp. Memo. at 29). For example, Reinsdorf highlights the *titles* of five marketing-related folders that were deleted from the Media Share Website to suggest that "critical evidence" was lost. (*Id.* at 27–28). However, Reinsdorf admits that he has copies of two of these folders, MKTGPresentation and MTKG_BINDER_JAN2012/, from the December 2012 preservation. (Rubin Decl. ¶ 10). Nonetheless, Reinsdorf does not even attempt to argue that anything in the contents of these two folders is relevant to his claims. Indeed, Reinsdorf does not cite to the contents of *any* of the 128 files from the 21 later-deleted folders he copied in the December 2012 preservation. In addition, Skechers produced a copy of a third folder on Reinsdorf's list, INTL_MRKTGIMAG-ES_WSTARBURST_ROYAL_36x18Folder/, the contents of which Reinsdorf similarly passes over in silence. (Supp. Memo. at 27; Breuder Decl. at 7). The only document on Reinsdorf's list of five that Reinsdorf actually discusses is the 2010 Marketing Binder, which Reinsdorf downloaded prior to the December 2012 preservation. (Supp. Memo. at 29; Ruga Decl. ¶ 16; Rubin Decl. ¶ 9).

The 2010 Marketing Binder contained copies of Reinsdorf's photographs and Skechers admits that it should have been produced. (Welsh Decl. ¶ 36). However, Skechers produced another document with the same name, and there is no logical reason to infer that the failure to produce the 2010 Marketing Binder that Reinsdorf downloaded was anything but inadvertent. Reinsdorf does not point to any smoking gun in the 2010

Marketing Binder that would provide a credible reason to withhold it in light of the other documents Skechers produced. Skechers' explanation, that it believed it had produced the 2010 Marketing Binder due to the similarity in title with another document that was produced, is more credible. (Welsh Decl. ¶ 36). The Court finds that the deletion of the 2010 Marketing Binder was, at most, negligent.

The Court further finds that Reinsdorf was not prejudiced by Skechers' failure to produce the 2010 Marketing Binder. In the first instance, Reinsdorf actually has a copy of the document. More importantly, however, Skechers produced other, and in some instances, identical or better evidence of Skechers' alleged infringement. In light of Skechers' production of similar and more probative evidence, Reinsdorf's contention that the 2010 Marketing Binder was "critical" evidence is simply not persuasive. (*See* Welsh Decl., Exhs. S, T, U, V, W, X & Y). In addition, Reinsdorf already possessed evidence of the same alleged infringing behavior, which he produced to Skechers in discovery. (*Id.,* Exhs. Z, AA & BB). Therefore, the photographs in the 2010 Marketing Binder were merely cumulative evidence not essential to Reinsdorf's case because he has ample evidence of the alleged use of his photographs beyond the license. Furthermore, the loss of metadata associated with the 2010 Marketing Binder is not material to Reinsdorf's case. As Skechers explained at the hearing, the metadata would show who looked at the 2010 Marketing Binder, but would not reflect how any images in the Binder were ever used. (Dkt. No. 328 at 60–61). The best evidence of what was used were the marketing reports, which Skechers produced. (*Id.* at 60). Skechers' deletion of the 2010 Marketing Binder and its accompanying metadata did not impair Reinsdorf's "ability to go to trial or threaten[ ] to interfere with the rightful decision of the case." *Leon,* 464 F.3d at 959 (internal quotation marks omitted).

The Court finds it significant that at the hearing, Reinsdorf was unable to explain how his case would have been different if he had received copies of the Media Share Website materials, including the 2010 Marketing Binder that he already possessed. (Dkt. No.

328 at 10–11). Reinsdorf was unable to identify any documents that he would have attached to his Opposition to the Motion for Summary Judgment that would have altered the Court's decision. (*Id.*). Indeed, Reinsdorf's reliance on the 2010 Marketing Binder for instances of infringement is not even relevant to his claim for indirect profits. Accordingly, even if Skechers had timely produced these documents to Reinsdorf, the outcome of Skechers' Motion for Summary Judgment would have been the same.

 The deletion of irrelevant evidence does not support a spoliation claim. *See Centrifugal Force,* 783 F.Supp.2d at 750 ("[A] discovery sanction cannot be based on a failure to preserve irrelevant evidence"). Mere speculation that other deleted documents may exist that might be helpful to a party's case is also an insufficient basis for a finding of spoliation. *Tri–County Motors, Inc. v. American Suzuki Motor Corp.,* 494 F.Supp.2d 161, 177 (E.D.N.Y.2007) ("[S]peculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence."); *see also Zubulake IV,* 220 F.R.D. at 221 (there is "no reason to believe" that additional evidence would support plaintiff's claim where substantive sampling did not contain relevant information). Reinsdorf has failed to satisfy his burden of demonstrating that he was deprived of any material evidence by Skechers' alleged destruction of documents. Accordingly, Reinsdorf's spoliation claim fails.

## VII.

### CONCLUSION

Reinsdorf has, at best, shown one or two instances of imperfect conduct. However, the Federal Rules of Civil Procedure do not require perfection or a guarantee that every possible responsive document has been found or produced. When a party responds to discovery requests, the Rules require only that the search for responsive materials be objectively reasonable.

Furthermore, Reinsdorf is bound by the strategic choices of his prior counsel. Reinsdorf has not shown misconduct by Skechers such that he should not bound by prior coun-

sel's litigation decisions and be permitted to re-open discovery. Moreover, Reinsdorf has not shown prejudice, as there is no evidence that any item of evidence Reinsdorf sought or even presently seeks would alter the result on Skechers' Motion for Summary Judgment. Accordingly, Reinsdorf has not met his burden of demonstrating discovery misconduct sufficient to either reopen discovery or issue other discovery sanctions.